PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROBIN MCKENNEL LOVITT,
       *Petitioner-Appellant,*

v.

WILLIAM PAGE TRUE, Warden,
Sussex I State Prison,
       *Respondent-Appellee.*

No. 04-28

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(CA-03-1061-3)

Argued: February 1, 2005

Decided: April 6, 2005

Before WILKINSON, WILLIAMS, and TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Williams and Judge Traxler joined.

---

## COUNSEL

**ARGUED:** Kenneth Winston Starr, KIRKLAND & ELLIS, L.L.P.,
Washington, D.C., for Appellant. Katherine P. Baldwin, Senior Assis-
tant Attorney General, OFFICE OF THE ATTORNEY GENERAL
OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Rob-
ert E. Lee, VIRGINIA CAPITAL REPRESENTATION RESOURCE
CENTER, Charlottesville, Virginia; Thomas D. Yannucci, Ashley C.

Parrish, Steven A. Engel, Sookyoung Shin, KIRKLAND & ELLIS, L.L.P., Washington, D.C., for Appellant. Jerry W. Kilgore, Attorney General of Virginia, Richmond, Virginia, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Robin Lovitt was convicted and sentenced to death for the murder of his former co-worker during the commission of a robbery. His challenges to his conviction and sentence — under *Strickland*, *Brady*, and *Youngblood* — have been heard by many courts. The Supreme Court of Virginia rendered two thorough and conscientious opinions in his case — one on direct appeal and one on habeas. The state habeas court in Arlington also treated Lovitt's claims with care, holding a two-day evidentiary hearing and authoring detailed findings of fact and conclusions of law. Finally, the federal district court again reviewed Lovitt's claims, and dismissed them in a meticulous and lengthy opinion.

This case is a good example of the care with which state courts should treat capital cases. We think the Virginia Supreme Court properly resolved Lovitt's claims. Even if that were not the case, however, we could not begin to say that it unreasonably applied clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1) (2000). In so concluding, we affirm the judgment of the district court dismissing the petition.

I.

A.

The Virginia Supreme Court has provided a full account of the facts of the murder on Lovitt's direct appeal, *see Lovitt v. Commonwealth*, 537 S.E.2d 866 (Va. 2000) ("Lovitt I"), so we need only summarize the salient evidence here.

On November 18, 1998, Clayton Dicks was brutally murdered at the pool hall where he worked in Arlington County. Dicks was

stabbed six times in his back and chest. When his body was found, the police discovered that the pool hall's cash register had been broken and one of the drawers was missing.

Also missing that morning was a pair of orange-handled scissors kept next to the register. A police canine unit found scissors of a similar description lying in the woods about fifteen yards behind the pool hall. Those scissors had blood on them which matched the DNA of Clayton Dicks. Amy Hudon, a manager at the pool hall, testified that two months before Dicks was murdered, the cash register drawer was not opening properly. Robin Lovitt, an employee of hers at the time, assisted her by prying a pair of scissors into the drawer's latch and forcing it open.

Clayton Dicks was scheduled to work the late managerial shift at the pool hall on the night he was murdered. He arrived for work between 1:30 and 2:00 in the morning. The other employees left the pool hall by 3:00 a.m., making Dicks the only employee remaining on the premises. At 3:25 a.m., Jose Alverado and Carlos Clavell arrived at the pool hall and witnessed two men fighting behind the bar. Alvarado testified that he saw the shorter man stab the taller man six or seven times with a silver-colored weapon. Once the taller man fell to the floor, Alvarado said he saw the shorter man repeatedly kick him. At the preliminary hearing, Alvarado could not say he was 100% certain that Lovitt was the assailant, but he did testify at trial that he was 80% sure.

Warren Grant is Lovitt's cousin. He lives on the "other side of the woods" from the pool hall, about a quarter mile away. Grant testified that Lovitt arrived at his house between 1:30 and 3:00 on November 18th. Grant said Lovitt was carrying a large square metal box. The two cousins opened the box with a screwdriver and split the money that was inside.

The government's theory at trial was that Lovitt used the scissors to pry open the cash register but was caught in the act by Dicks. Thus surprised, Lovitt allegedly stabbed Dicks several times with the scissors before fleeing with the cash-register drawer to his cousin's house, discarding the scissors along the way.

In support of this theory, a forensic scientist testified that the cash register drawer that had been found at Grant's house did in fact come from the pool hall register, and that the pry marks on the drawer were made by the same scissors that were found in the woods. Another scientist testified that the chance of someone other than Dicks contributing to the DNA sample on the tip of the scissors found in the woods was 1 in more than 5.5 billion.

Another key witness for the prosecution was Casel Lucas. Lucas was an inmate at the Arlington County jail who befriended Lovitt during the two months they lived together in the same unit. Lucas testified that Lovitt confided in him about murdering Dicks. According to Lucas, Lovitt said he waited in the bathroom late at night on November 18 until he knew everyone but Dicks had left the pool hall. Apparently, Lovitt then attempted to jimmy open the cash register drawer. When confronted and recognized by Dicks, Lovitt told Lucas he stabbed Dicks several times and took the cash register drawer to his cousin's house before leaving to buy drugs.

After hearing all of this evidence, on September 20, 1999, a jury found Robin Lovitt guilty of the capital murder of Clayton Dicks during the commission of a robbery.

In a separate sentencing proceeding, the government sought the death penalty for Lovitt on a theory of future dangerousness. *See* Va. Code Ann. § 19.2-264.4. The prosecutors introduced evidence of Lovitt's rather extensive criminal history, starting with charges of assault when he was just eleven years old. The jury learned that while at a juvenile detention center during his teenage years, Lovitt was disciplined for fighting, assault, and possession of contraband. He was convicted of grand larceny in 1981 and served 12 months in jail. At various times in his life, Lovitt was convicted of petit larceny, grand larceny, breaking and entering, distribution and possession of narcotics, attempted robbery, parole violations, destruction of property, and assault and battery. Lovitt was on parole at the time of Dicks's murder.

To mitigate this evidence, Lovitt's attorneys presented testimony from the guards at the Arlington County jail. Those officers stated that Lovitt had not caused any disciplinary problems while in jail on

the present charges, and in fact regularly attended Bible study and AA meetings. Lovitt also offered testimony from his half-sister, Lemanda Jones, who testified that Lovitt was the oldest of twelve children who took care of his younger siblings.

The jury weighed the aggravating and mitigating evidence and ordered death as the punishment for Lovitt's murder conviction.

## B.

Lovitt appealed to the Supreme Court of Virginia, which affirmed his conviction and sentence on November 3, 2000. *Lovitt I*, 537 S.E.2d 866 (Va. 2000). In October of the following year, the United States Supreme Court denied Lovitt's petition for a writ of certiorari. 534 U.S. 815 (2001).

In May 2001, virtually all of the evidence from Lovitt's trial was thrown away as ordered by Robert McCarthy, a clerk in the Arlington County Circuit Court. McCarthy did not notify anyone at the Commonwealth Attorney's Office of his intentions to dispose of these items. He had the evidence discarded in order to make additional space in the evidence room, and because he had received a mandate from the Supreme Court of Virginia indicating that Lovitt's appeal was over.

In January of 2002, Lovitt's new court-appointed counsel filed a state petition for a writ of habeas corpus. The petition alleged, among others, (1) that Lovitt's due process rights were violated because the state destroyed evidence and thus prevented adequate habeas review, (2) that the prosecution willfully suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and (3) that his trial counsel provided ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984).

The Supreme Court of Virginia reviewed Lovitt's petition, and decided that it raised issues of fact which required an evidentiary hearing to resolve. Thus, at the Supreme Court's direction, the Circuit Court of Arlington County held a two-day evidentiary hearing on June 18 and 19, 2002. Prior to the hearing, the circuit court granted

much of Lovitt's extensive discovery requests. Accordingly, Lovitt was permitted to depose the two Assistant Commonwealth's Attorneys who prosecuted his case, and the head clerk of the court where the evidence was destroyed. He was also authorized to subpoena the social service records of many of his family members and he was given copies of certain records from the prosecutor's files.

Following this comprehensive evidentiary hearing in which live testimony was heard from over twenty witnesses, the circuit court issued a report with approximately fifty detailed findings of fact and over ten pages of proposed conclusions of law. It recommended that Lovitt's petition be denied.

The state supreme court then reviewed Lovitt's claim once more — ordering a full briefing from the parties and oral argument. The court reviewed the Arlington circuit court's factual findings to ensure they were supported by the evidence, and it reviewed all legal issues de novo. On September 12, 2003, the Supreme Court of Virginia unanimously accepted the circuit court's findings and recommendations. *Lovitt v. Warden*, 585 S.E.2d 801 (Va. 2003) ("Lovitt II"). Lovitt's state habeas petition was dismissed, and his subsequent writ of certiorari to the United States Supreme Court was denied seven months later. 124 S.Ct. 2018 (2004).

Having exhausted direct appeal and state collateral review, Lovitt turned to federal court. On December 23, 2003, the United States District Court for the Eastern District of Virginia stayed Lovitt's execution, allowing him to petition for federal habeas corpus relief under 28 U.S.C. § 2254. That court heard oral argument and reviewed (among others) Lovitt's *Strickland*, *Brady*, and destruction of evidence claims. In a lengthy opinion, it concluded that Lovitt's petition was rightly dismissed. *Lovitt v. True*, 330 F. Supp. 2d 603 (E.D. Va. 2004). Lovitt now appeals that decision. On October 12, 2004, the district court granted Lovitt's application for a certificate of appealability on three of his four claims, and this court expanded the order on November 9, 2004, to include the fourth claim. 28 U.S.C. § 2253(c) (2000).

## II.

Lovitt's federal habeas petition was filed pursuant to 28 U.S.C. § 2254, which was amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"). With this statute, Congress provided a federal habeas remedy for state prisoners, but only when the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has interpreted these provisions to require that federal courts accord considerable deference in their review of state habeas proceedings. *(Terry) Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Thus, a state court decision is only "contrary to" clearly established law when it "applies a rule that contradicts the governing" Supreme Court holding or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Id.* at 405-406.

Similarly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. *See also Booth-El v. Nuth*, 288 F.3d 571, 576 (4th Cir. 2002) (stressing the Supreme Court's recognition that Congress chose the word "unreasonable" in AEDPA instead of the word "erroneous" or "incorrect"). Further, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003).

When Congress crafted this deferential standard of review in AEDPA, it was at least partially motivated "to limit federal intrusion

into state criminal adjudications." *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000). It is, after all, the job of state courts to faithfully apply federal law. U.S. Const., Art. VI, cl. 2. Their efforts in this regard are to be respected as the acts of sovereign entities, whose sworn allegiance to the Constitution and the laws of the United States is as solemn as our own.

Keeping in mind the deference we owe to the Virginia courts, we take up Lovitt's claims in the order he presents them.

### III.

Lovitt first asserts that his trial lawyers provided him with ineffective assistance of counsel. He claims that they "hardly investigated [his] background at all" and thus neglected to present relevant mitigating evidence at sentencing about his "nightmarish childhood." This performance, Lovitt says, violated his Sixth Amendment right to counsel.

The standard used for evaluating ineffective assistance claims was set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). The now familiar *Strickland* test requires a two-part showing: (1) counsel's performance must have fallen "below an objective standard of reasonableness," and (2) that "deficient performance" must have "prejudiced the defense." *Id.* at 687-88.

The Supreme Court of Virginia rejected Lovitt's argument by holding that any alleged deficiencies on the part of Lovitt's lawyers did not alter the outcome of his sentencing. *Lovitt II*, 585 S.E.2d at 825. The district court agreed with that conclusion, but additionally held that Lovitt's counsel performed in an objectively reasonable way. *Lovitt*, 330 F. Supp. 2d at 645. Although it was perfectly appropriate for the Virginia court to rely exclusively on the prejudice prong of *Strickland*, we will nonetheless address both parts of the test here.

### A.

Lovitt correctly notes that in death penalty cases, counsel must adequately investigate and present evidence in mitigation of guilt. *Wil-*

*liams*, 529 U.S. at 393. *See also Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003). However, in assessing a lawyer's performance in this regard, the Supreme Court has emphasized that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003). And, when courts review these decisions, "every effort [must] be made to eliminate the distorting efforts of hindsight." *Strickland*, 466 U.S. at 689.

In many cases, counsel's decision not to pursue a particular approach at sentencing reflects not incompetence, but rather a sound strategic choice. *See Rose v. Lee*, 252 F.3d 676, 693 (4th Cir. 2001). *Accord Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991). The district court found that Lovitt's attorneys "made a reasoned, informed, and strategic decision not to introduce [Lovitt's] social history records during the sentencing phase of trial." *Lovitt v. True*, 330 F. Supp. 2d 603, 642. For the reasons that follow, we agree.

First, we think it relevant that the state habeas court found that Lovitt "did not give counsel permission to speak to members of his family, and he stated to counsel that his family does not care about his situation." JA 230; *See also Lovitt*, 330 F. Supp. 2d at 643. We need not hold that heeding instructions of this sort from a capital defendant renders counsel's performance effective in every set of circumstances. But capital sentencing proceedings do not set at naught the basic principle of attorney-client relations: namely that counsel, for all their learning and experience, remain in the end the agents of the one most intimately affected. Lovitt is correct to insist that a client's decision in this regard should be an informed one. At the same time, however, Lovitt's lawyers were hardly ineffective for incorporating their client's wishes into their professional judgment. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . In particular, what investigation decisions are reasonable depends critically on such information").

Second, Lovitt's two seasoned attorneys knew that the information about Lovitt's family background was classic double-edged evidence. The Virginia Supreme Court noted, "in preparation for trial, [Lovitt's

attorneys] obtained 'all of Lovitt's jail records from the Arlington County Detention Facility, all of his juvenile records, his records from the Beaumont juvenile facility, his medical records, and his presentence report.'" *Lovitt II*, 585 S.E.2d at 814 (quoting a factual finding from the circuit court). Lovitt's lawyers were also familiar with Lovitt's family because they had represented many of them in prior criminal proceedings. They knew that all five of Lovitt's brothers were incarcerated, that at least two of his six sisters had criminal records, and that Lovitt's family had a long history of drug use and a reputed "predilection for criminal activity" in the community.

After listening to Lovitt's lawyers testify at the state habeas hearing, the court found that they had "made a strategic decision not to present evidence that would have described Lovitt's and his family's extensive drug use because they believed such evidence would have invited the Commonwealth to argue that Lovitt murdered the victim for a rock of crack cocaine." As one of Lovitt's lawyers explained at the hearing:

> I was trying to avoid the connection between Robin and substance abuse. . . . I was fearful that . . . the door would be open, that the prosecution could parade up and down in front of that jury with a piece of simulated crack and argue, This is the value that Mr. Robin Lovitt put on Mr. Dicks's life. And I was terribly afraid that that would be devastating testimony in front of a jury, and I was doing everything I could to avoid that connection.

JA 568.

This decision does not represent deficient lawyering. Lovitt's lawyers were contesting the government's theory that Lovitt posed a risk of future danger. *See* Va. Code Ann. § 19.2-264.4. As one of them explained at the habeas hearing, "[t]he Commonwealth was concentrating on [trying] to get the death penalty on future dangerousness. . . . So I thought [the way] to combat the future dangerousness was to demonstrate what a good prisoner he had been." JA 545.

This strategy of not risking a more determined prosecutorial onslaught with respect to Lovitt's problematic past was sensible. For,

if Lovitt's lawyers had pursued a strategy of mitigation that focused on Lovitt's social history, they risked calling further attention to Lovitt's drug addiction, underscoring his "quick temper" and "physical aggressiveness" referenced in his social records, and hammering home his checkered criminal past. His lawyers chose not to emphasize this part of Lovitt's life but instead to focus on the fact that Lovitt had behaved well recently, participated in a prison Bible study, and attended Alcoholics Anonymous meetings. *See Lovitt II*, 585 S.E.2d at 823. This was not an unreasonable decision. For when a defendant's family background is "by no means uniformly helpful" to him since it "suggest[s] violent tendencies," it is reasonable to choose not to present it. *Burger v. Kemp*, 483 U.S. 776, 793 (1987). *See also Hunt v. Lee*, 291 F.3d 284, 292 (4th Cir. 2002).

Third, despite Lovitt's contentions to the contrary, his trial lawyers' strategic decisions were different from the ones made by the lawyers in *Wiggins*. Trial counsel in *Wiggins* chose to focus almost exclusively on contesting guilt and hardly presented any mitigation evidence at all, despite counsels' exposure to records alluding to the petitioner's extensive history of childhood sexual abuse and rape. *Wiggins*, 539 U.S. at 526, 534-35. The Supreme Court found this to be an unreasonable professional error. *Id.* at 534. But, in so doing, it also noted that Wiggins's social history contained "little of the double edge we have found to justify limited investigations in other cases." *Id.* at 535. We think the present situation is a precise example of what the Supreme Court was referencing when making this distinction.

While the lawyers in *Wiggins* limited their investigation artificially and were thus making decisions in the dark, *id.* at 527-28, the lawyers in Lovitt's case were personally familiar with Lovitt's family history and were well aware of the skeletons that would be found in that closet. While the lawyers in *Wiggins* did not present any evidence of the defendant's life history at all, *id.* at 515, the lawyers in Lovitt's case introduced evidence from Lovitt's half-sister about Lovitt's alcoholic step-father and from prison guards who testified that Lovitt behaved well in jail. While the lawyers in *Wiggins* made a decision which "resulted from inattention," the lawyers in Lovitt's case made a deliberate choice which resulted from a "reasoned strategic judgment." *Id.* at 526. We cannot ignore these differences.

Finally, we note that Lovitt's attorneys found themselves between a rock and a hard place. Had they ignored Lovitt's advice and interviewed his family members without his consent, then they could be accused of being ineffective for ignoring their client's wishes. Had they introduced his family as witnesses and watched them be impeached through their own criminal histories on cross-examination, then counsel could be accused of being ineffective for not anticipating that disaster. And, no matter how adroitly the pivot was made, had they presented an inconsistent approach between the guilt phase and the penalty phase (he did not do it, but if he did, this is why), then they could be accused of being ineffective for forfeiting the trust of the jury.

We refuse to place defense lawyers in this position. "Trial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case." *Bunch*, 949 F.2d at 1364. Therefore, "[t]he best course for a federal habeas court is to credit plausible strategic judgments." *Id. See also Truesdale v. Moore*, 142 F.3d 749, 754-55 (4th Cir. 1998). To do otherwise would be a transparent misuse of the habeas court's power of hindsight.

B.

Even if Lovitt's counsel had been deficient in their performance, we agree with the Supreme Court of Virginia that the outcome of the penalty phase in Lovitt's trial would have remained the same. The relevant question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. *See also Byram*, 339 F.3d at 209. To answer this question, the Virginia court properly observed that "[i]n determining prejudice, we 'reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Lovitt II*, 585 S.E.2d at 824-25 (quoting *Wiggins*, 539 U.S. at 534 and citing *Williams v. Taylor*, 529 U.S. at 397-98).

As the Virginia court noted, the aggravating evidence in Lovitt's case was quite severe. It included "the brutal nature of the attack on

Dicks, the fact that Lovitt murdered Dicks solely to eliminate any witness to the robbery . . . , Lovitt's prior record [of] numerous felonies, . . . [and the fact that Lovitt] was on parole at the time he murdered Dicks." *Id.* at 825.

By contrast, the mitigating evidence that Lovitt says should have been presented to the jury was what the Virginia Supreme Court described as "mixed." *Id.* The court explained that although the testimony at the habeas hearing described an abusive and alcoholic stepfather, other evidence in the juvenile records contained social worker descriptions of Lovitt's childhood home as being "very clean and nicely furnished" with parents who were "strong individuals who provided Lovitt with a stable home life." *Id.* at 824.

Further, while general allegations of sexual abuse in Lovitt's family were made at the habeas hearing, the Virginia court found that "there is no evidence describing the nature or extent of sexual abuse allegedly inflicted on Lovitt by his stepfather." *Id.* at 825. Without this, the court concluded it "would have to resort to speculation to consider any sexual abuse that Lovitt may have suffered."[1] *Id.* Quite reasonably, the court declined to do so.

Not only did the Supreme Court of Virginia find the mitigating evidence in Lovitt's case to be occasionally contradictory and to require speculation, but it further noted that much of "this evidence could be viewed both in aggravation and in mitigation of the offense." *Id.* For example, evidence in Lovitt's juvenile records indicated that Lovitt "began a cycle of crime and aggressive behavior at an early age" and indicated that he "had a serious problem with anger." *Id.* at 824-25. It is entirely possible that presenting evidence of Lovitt's social history to the jury and drawing attention to this can of worms would have actually hurt Lovitt's case, rather than helped it.

---

[1]Lovitt directs our attention to parts of the record which contradict this assertion by the Virginia Supreme Court. But we note that even the sections highlighted by Lovitt in his brief never allege Lovitt's sexual abuse outright, but only in speculative or general terms. *See, e.g.*, Petitioner's brief p. 27(referencing testimony by Lovitt's half-sister about sexual abuse: "The boys haven't really said a lot about it but it was pretty much all of us.").

In addition to re-weighing the mitigating and aggravating factors, the Supreme Court of Virginia also properly identified the relevant Supreme Court precedents — *Williams* and *Wiggins* — and proceeded to apply those cases with great care. The court noted several distinctions between those cases and Lovitt's case, and concluded, properly, that these differences greatly altered the prejudice analysis.

First, the Virginia Supreme Court carefully distinguished *Wiggins*. As noted above, the penalty phase in *Wiggins* contained no evidence of the defendant's life history, with counsel instead seeking to prove that he did not actually commit the crime. *Wiggins*, 539 U.S. at 515. By contrast, as the Virginia court pointed out, the penalty phase in Lovitt's case contained recent personal history (the testimony from the prison officials) and some family history as well (testimony from his half-sister, Lemanda Jones).

The Virginia court found two additional important differences between Wiggins and Lovitt. Wiggins had a diminished mental capacity and no criminal record, neither of which his counsel emphasized. *Id.* at 535-536. By contrast, the Virginia court noted that there was no indication that Lovitt had a diminished mental capacity, and he did in fact have a lengthy criminal record. *Lovitt II*, 585 S.E.2d at 825. Lovitt says these distinctions are immaterial. But we cannot believe that it would not make a difference to a jury whether a defendant had a mental impairment and whether he was a career criminal or a first-time offender.

Similarly, the Virginia court found *Williams* to be distinguishable on its facts. Like Wiggins — and unlike Lovitt — Williams was found to have a mental disorder. *Williams*, 529 U.S. at 396. And, in contrast to the arguably conflicted evidence in Lovitt's case, Williams had unquestionably suffered extreme abuse — his parents had been imprisoned for two years for criminally neglecting him. *Id.* at 395. Finally, the Court was disturbed in *Williams* by the fact that the defendant's attorneys never introduced a witness who offered to testify about the defendant's positive adjustment to prison life. *Id.* at 396. Here, by comparison, similar witnesses did in fact speak to the jury on Lovitt's behalf.

Thus, the Supreme Court of Virginia properly identified the Supreme Court cases it was to apply to Lovitt's ineffectiveness claim

— *Strickland*, *Wiggins*, and *Williams*. We think the court properly applied these holdings, but in any event it certainly did not apply them unreasonably. 28 U.S.C. § 2254(d)(1). We therefore uphold the Virginia court's rejection of Lovitt's *Strickland* claim.

IV.

Lovitt additionally argues that the outcome of his case is unconstitutional because the prosecution failed to disclose material exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

For a *Brady* claim to be successful, three requirements must be met: "(1) the evidence must be favorable to the accused, (2) it must have been suppressed by the government, either willfully or inadvertently, and (3) the suppression must have been material." *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003). This last element, the question of materiality, depends on whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Lovitt says the prosecutors in his case withheld two material pieces of evidence: the opinion of a medical examiner and the prison informant's history of cooperating with the government. Because we agree with the Supreme Court of Virginia that neither piece of evidence was "material," within the meaning of *Brady* and *Kyles*, we reject both arguments.

A.

Lovitt's first argument under *Brady* concerns the opinion of Dr. Marie Pierre-Louis, the medical examiner who performed the autopsy on the victim and who testified at Lovitt's trial.

During trial, Dr. Pierre-Louis was not asked about whether the bloody scissors admitted into evidence were consistent with Dicks's stab wounds. However, prior to trial, she did examine two pairs of scissors found at the scene (she was not presented with the bloody

pair found in the woods). At that time, she opined that scissors with three and a half inch long blades could not have caused all of Dicks's wounds, some of which were eight inches deep. This opinion was not revealed to Lovitt's defense team. Nonetheless, Lovitt's lawyers did have access to Dr. Pierre-Louis's autopsy report — which explicitly mentions that investigators presented scissors to her with three and a half inch long blades— and counsel of course had the chance to cross-examine her at trial.

First, we note that "materiality is not considered item by item, rather it must be assessed collectively." *McHone v. Polk*, 392 F.3d 691, 697 (4th Cir. 2004) (citing *Kyles*). In Lovitt's case, after surveying all of the evidence, it is hard to believe that the doctor's opinion would have seriously undermined the conclusion that the scissors were the murder weapon.

As the district court observed, Dr. Pierre-Louis never examined the actual pair of scissors believed to be the murder weapon. *Lovitt*, 330 F. Supp. 2d at 613. That pair of bloody scissors with the victim's DNA on it was found on the flight path from the murder scene. A forensic expert testified that those bloody scissors conclusively matched pry marks found on the cash register drawer. And that very drawer was ultimately discovered at the home of the defendant's cousin who testified that the defendant had brought it there. Under these circumstances, Lovitt is hard pressed to show, as he must, that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Next, we observe several key factual findings made by the state habeas court after its evidentiary hearing. The circuit court found that "[a]fter DNA test results came back confirming that the victim's blood was on the scissors, Dr. Pierre-Louis indicated to the Commonwealth's attorneys that she had been wrong in her [first] conclusion regarding the scissors." This divergence in view undercuts the materiality of the doctor's initial assessment, and makes it less probable that the assessment would have altered the outcome of the trial.

Moreover, the circuit court found that Lovitt's trial attorneys — without talking to Dr. Pierre-Louis — independently questioned

whether scissors could inflict Dicks's wounds. This concern led them to contact a separate Commonwealth expert who told them "that in a frenzied violent attack, the tissue of the body can become compressed, and that it was conceivable that these scissors were capable of being the murder weapon."

In light of these important factual findings, we cannot say that Dr. Pierre-Louis's initial opinion — after examining scissors other than the alleged murder weapon — constituted material exculpatory evidence under *Brady*. The Supreme Court of Virginia was certainly not unreasonable to so conclude.

Finally, we are persuaded by the opinion of the district court which emphasized Lovitt's access to Dr. Pierre-Louis's opinion before trial. *Lovitt*, 330 F. Supp. 2d. at 616 ("[A]s both the circuit court and the Supreme Court of Virginia found, prior to trial, Lovitt's attorney . . . had access to Dr. Pierre-Louis and could have asked her to compare the victim's wounds to the various pairs of scissors.")

Before trial, Lovitt's attorneys obtained a copy of the autopsy report, had access to the bloody scissors, and could have easily questioned Dr. Pierre-Louis about the scissors on cross-examination. We have explained before that "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990). Such was the case here.[2]

---

[2]Lovitt makes an additional claim regarding Dr. Pierre-Louis's opinion. He argues that the prosecutors misled the jury since they were aware of the doctor's opinion and nevertheless argued that the 3 inch scissors found in the woods were the murder weapon.

We do not find this argument persuasive on its merits, but in any event, we agree with the Supreme Court of Virginia that Lovitt defaulted this claim because he did not raise it in his habeas petition. *See Lovitt II*, 585 S.E.2d at 817, n.4. We decline to excuse this failure to comply with state procedural rules because we do not find "cause" for the default. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

After all, as the district court noted, when Lovitt filed his state habeas petition, he attached a copy of the autopsy report and alleged — in con-

### B.

The second part of Lovitt's *Brady* allegation involves Casel Lucas, the prison inmate who testified against Lovitt at trial. It is undisputed that Lucas did not receive and was not promised a benefit for testifying in Lovitt's trial. However, Lovitt says Lucas is a "professional snitch" who had a long history of cooperating with the government. He says the prosecutors should have provided Lucas' witness history to the defense for use as impeachment material. *See United States v. Bagley*, 473 U.S. 667, 676 (1985)(explaining that evidence to impeach a witness's credibility counts as exculpatory for purposes of a *Brady* claim).

According to Lovitt, Lucas had cooperated with the government in the D.C. and Northern Virginia area on four different occasions: in the Evans case, the Young case, the Lee case, and in the "D.C. Starbucks triple homicide" case. The prosecutors did not inform Lovitt's lawyers of Lucas' role in any of these cases. Significantly, however, the Virginia Supreme Court found that Lovitt's prosecutors were only aware of Lucas' involvement in one of these cases, the Evans case. *Lovitt II*, 585 S.E.2d at 812. We have no reason to doubt its conclusion. 28 U.S.C. § 2254(d)(2).

As an initial matter, we think petitioner exaggerates the value of this information. With respect to the Young, Lee, and Starbucks cases, although Lucas may have had a unilateral expectation of a benefit for his assistance, it is clear that he did not receive one in any of these cases. *Lovitt II*, 585 S.E.2d at 812. Moreover, there is no indication that Lucas' prior testimony was anything but truthful. *See Lovitt I*, 537 S.E.2d at 872. The exculpatory value of evidence is limited when the effect of disclosure might well be to emphasize to the jury that the prior testimony was in fact accurate.

---

nection with his *Brady* claim — that the medical examiner did not believe Dicks's wounds could be caused by the scissors. *See Lovitt*, 330 F. Supp. 2d at 627. If Lovitt was able to use this information to formulate a *Brady* claim when he filed his habeas petition, then there is no reason why he could not have used the same information to make a claim of prosecutorial misconduct at that time.

In any event, because the prosecutors were not aware of Lucas' participation in the Young, Lee, and Starbucks cases, we need not ask whether this information was material. *See United States v. Agurs*, 427 U.S. 97, 103 (1976)(*Brady* only applies when evidence is "known to the prosecution but unknown to the defense.") Of these three cases, only the Young case took place in Arlington County. However, as explained above, the state habeas court concluded that Lovitt's prosecutors had no knowledge of Lucas' assistance in the Young case (which had been prosecuted three years earlier). And, as the Supreme Court of Virginia noted, Lucas never testified in the Young case since it resulted in a guilty plea, which when taken by the court, was accompanied by a recitation of facts that contained no mention of a confession to Lucas at all. *Lovitt II*, 585 S.E.2d at 812.

As for the Lee and Starbucks cases, those cases were not even prosecuted in Arlington county. Admittedly, "an individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf." *Kyles*, 514 U.S. at 437. But we do not think this duty crossed jurisdictional lines in Lovitt's case. As the district court stated, "to require a prosecutor to mine the records of every surrounding jurisdiction in both the Commonwealth of Virginia and the District of Columbia, absent some specific information triggering such an inquiry, would be patently unreasonable." *Lovitt*, 330 F. Supp. 2d at 622.

This leaves only Lucas' participation in the Evans case. Once again the Supreme Court of Virginia identified the relevant Supreme Court precedent on this issue and concluded that "the failure to disclose this evidence did not place Lovitt's trial in a posture that would undermine confidence in the verdict." *Lovitt II*, 585 S.E.2d at 819 (citing *Kyles*, 514 U.S. at 514, and *Strickler v. Greene*, 527 U.S. 263, 290 (1999)).

In a phone interview the night before he testified, Lucas revealed to one of Lovitt's attorneys that he had cooperated with the government in the Evans case and, as a result, had received a reduced sentence. Lovitt's lawyers brought this out on cross-examination, and Lucas admitted as much to the jury. Additionally, prosecutors informed defense counsel of Lucas' extensive criminal record, and Lovitt's lawyers impeached Lucas' credibility by introducing his thir-

teen felony convictions into evidence. Had the Commonwealth told
Lovitt's lawyers earlier that Lucas had cooperated in the Evans case,
it is unclear what more Lovitt's attorneys could have done to under-
mine Lucas' credibility. *See United States v. Cole*, 293 F.3d 153, 163
(4th Cir. 2002)(suppression of impeachment evidence is not material
when ample information exists to effectively cross-examine witness).

For the aforementioned reasons, we agree with the Virginia courts
that no material exculpatory evidence was suppressed by Lovitt's
prosecutors.

V.

Finally, we address Lovitt's claim regarding the discarded evidence
in his case. In May 2001 (after the Supreme Court of Virginia had
affirmed Lovitt's conviction, but while Lovitt's petition for certiorari
was pending before the U.S. Supreme Court) Robert McCarthy, a
clerk in the Arlington county circuit court, directed that almost all of
the evidence in Lovitt's case be destroyed.

Lovitt, citing *Arizona v. Youngblood*, 488 U.S. 51 (1988), says the
state deliberately frustrated his efforts to obtain meaningful post-
conviction relief, and denied him due process of law. *Youngblood*
holds that where a defendant can show bad faith, the "failure to pre-
serve potentially useful evidence" constitutes a violation of the Due
Process Clause. *Id.* at 58.

Following a two-day evidentiary hearing, the state habeas court
found the following facts on this issue:

> This was an error in judgment by McCarthy, but I find that
> he prepared the order to destroy the exhibits because he had
> received a mandate from the Supreme Court indicating that
> Lovitt's appeal was finished, and he wanted to remove the
> box of exhibits from the evidence room to make additional
> space.

> There is no evidence to conclude that there was an intent by
> anyone in the Clerk's office to destroy exculpatory evi-
> dence.

> No one from the Commonwealth's Attorney's Office or the Attorney General's office had any knowledge that the evidence was going to be destroyed or was destroyed until months after the destruction had taken place.
>
> There is no evidence that any official of the Commonwealth acted in bad faith.

We agree with the state habeas court that Mr. McCarthy made a serious error in judgment in destroying the evidence. This error, however, cannot be attributed to the police or prosecution, and there is certainly no evidence that the prosecutors did away with anything in an attempt to prevail or foreclose further judicial review.

Moreover, we note that the evidence in this case was discarded by the clerk after Lovitt's trial had concluded and after the Supreme Court of Virginia had affirmed his conviction. As the Virginia court observed, this departs significantly from the *Youngblood* line of cases which instead involved pre-trial destruction of evidence. *See, e.g.*, *Youngblood*, 488 U.S. at 53-54; *Illinois v. Fischer*, 540 U.S. 544, 546-47 (2004) (discussing *Youngblood* in the context of pre-trial destruction of evidence). Extending the destruction of evidence rule today might impermissibly create a "new rule" on federal habeas review. *See Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994); *Teague v. Lane*, 489 U.S. 288, 301 (1989).

Yet we need not decide whether Lovitt asks for such a "new rule" with his *Youngblood* argument because an essential component of his *Youngblood* claim has not been met. The Supreme Court of Virginia observed that "under the *Youngblood* standard, a state's failure to preserve potentially useful evidence does not constitute a denial of due process unless a defendant can show bad faith on the part of the state." *Lovitt II*, 585 S.E.2d at 815.

The Virginia court noted McCarthy's testimony that "he thought he was authorized to destroy the trial exhibits after receiving a mandate from [the Supreme Court of Virginia] indicating that Lovitt's convictions were affirmed." *Id.* at 808. And that he "drafted the evidence destruction order without consulting anyone in the Commonwealth's Attorney's office, the Attorney General's office, or the Arlington

County Police Department. McCarthy also did not notify any of the circuit court judges, Lovitt's trial counsel, or his habeas counsel of the impending evidence destruction." *Id.* at 809. The court then returned to the critical finding of fact made by the circuit court that although Mr. McCarthy surely made an error in judgment, there existed no evidence of bad faith on anyone's part. *Id.*

This factual finding was not made on a whim. It was made as part of a detailed recitation of factual conclusions, and it came following a two-day hearing where numerous witnesses testified. Indeed, before making this finding, the habeas court went out of its way to consider every piece of evidence on this issue, including testimony from two of McCarthy's co-clerks who had advised McCarthy not to discard evidence in a capital case until after the defendant's execution. The habeas court heard all of this testimony and still found that no one acted in bad faith, and the evidence was instead thrown out simply to make more space. In light of this extensive review process, we cannot say that the Supreme Court of Virginia's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" as 28 U.S.C. § 2254(d)(2) requires.[3]

## VI.

Appellant has understandably sought to use his case as a symbol of all that goes wrong in the criminal justice system, at least as it pertains to capital punishment. But that view overlooks all that went right

---

[3]Lovitt points out that the Virginia General Assembly has recently enacted a law which requires the preservation of biological evidence in death penalty cases until after the judgment is executed. *See* Va. Code § 19.2-270.4:1(B). This statute had not come into effect at the time McCarthy drafted the destruction order. And, as the Supreme Court of Virginia noted, "although [the new law] became effective twenty days before entry of the destruction order, McCarthy was unaware of the statute's provisions when the evidence was destroyed." *Lovitt II*, 585 S.E.2d at 810.

Regardless, while this law strikes us as a very wise policy — one we expect clerks in the future will observe — it is not expressive of federal due process standards which govern Lovitt's claim.

in an imperfect system, to be sure, but one that is as fair and conscientious as human beings can make it. Petitioner's case has received the very best efforts of both the bench and the bar, as indeed all capital cases should.

We have reviewed Lovitt's claims with care, as did each of the various courts before us. We also express our appreciation for the quality of advocacy on both sides of this appeal. There is no right to effective assistance of counsel in a habeas proceeding, *see Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987), but petitioner was indeed effectively represented here. And the state's attorney likewise presented a thorough brief and able argument. In this respect also, the system worked as it should.

For the reasons expressed above, we affirm the judgment dismissing the petition.

*AFFIRMED*