# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00420-CR

**Mark Lee Martin, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT**
**NO. D-1-DC-08-205228, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Following the denial of his motion to suppress evidence, appellant Mark Lee Martin pleaded guilty to the offense of possession of a controlled substance, methamphetamine, in an amount more than four grams but less than two-hundred grams. The district court entered an order placing Martin on deferred adjudication community supervision for a period of five years. In two issues on appeal, Martin challenges the district court's ruling on his motion to suppress, asserting that the State failed to preserve exculpatory evidence in violation of his rights under the United States and Texas Constitutions. We will affirm the order of deferred adjudication.

## BACKGROUND

At the hearing on Martin's motion to suppress, the district court heard evidence that on the night of August 29, 2008, Deputy Darren Jennings of the Travis County Sheriff's Office conducted a traffic stop on a vehicle that, according to Jennings, had failed to signal a left turn.

When Jennings approached the vehicle and began speaking with the driver, later identified as Martin, Jennings "could smell an odor of marihuana coming from inside the vehicle." Jennings then asked Martin to get out of the vehicle. After Martin did so, Jennings observed him put his hands in his pants pockets. Jennings proceeded to perform a pat-down search for weapons and felt an item in Martin's "watch pocket" that he believed to be a razor blade. Jennings instructed Martin to empty that pocket, and Martin pulled out "a small plastic bag with crystals in it" that Jennings "recognized through experience and training to be meth, methamphetamine." Jennings then placed Martin under arrest, searched his vehicle incident to arrest, and found marihuana and additional methamphetamine inside the vehicle. Jennings also testified that Martin made statements to him at some point following his arrest in which he admitted that the substance found in his pocket and vehicle was methamphetamine.

On September 11, 2008, Martin's attorney sent Jennings a letter via certified mail requesting that he "preserve any and all videos which were made regarding [the traffic stop and arrest] and any videos made by you or any officer, which were made prior to and during the arrest and transportation to jail of Mark Lee Martin on August 29, 2008." In addition to the letter, two subpoenas were also issued seeking production and delivery of all evidence in the case, including "all videos and dispatch calls" from the incident. The first subpoena was directed to the "Travis County Sheriff's Custodian of Records" in September 2008. The second subpoena was directed specifically to Jennings in October 2009.

At the suppression hearing held in November 2009, Jennings testified that the hearing was "the first time" he had seen the letter. As for the subpoenas, Jennings acknowledged that he

had been served with the October 2009 subpoena but was unsure whether he had seen the other subpoena. Martin then proceeded to question Jennings as to the availability of any video recordings of the traffic stop. The following testimony was elicited:

> Q: [I]s your car equipped with a video recording device?
>
> A: Yes, sir.
>
> Q: Okay. And was it so equipped on the evening of August 29, 2008, whatever day it was?
>
> A: Twenty-ninth, [2008]. At this time, I—I'd like to say yes. But as far as whether or not it was or it was working, I have no clue.
>
> . . . .
>
> Q: Well, let me ask you this: You had a video in your car, correct?
>
> A: Yes, sir.
>
> . . . .
>
> Q: Well, let me ask you this: Was the video from that evening preserved?
>
> A: No, sir.
>
> Q: And why was it not preserved?
>
> A: Since I didn't put it in my report it wasn't preserved because I didn't believe it had any type of evidential value.

Martin then asked Jennings if he was aware of the policies and procedures of the Travis County Sheriff's Office regarding mobile videotaping equipment, a copy of which had been admitted into evidence. The State objected on the basis of relevance, and Martin responded, "Well, it's very relevant because the officer destroyed evidence that would be pertinent to this hearing. And

3

under the appropriate case law, Your Honor, I think we're entitled to dismissal [or] suppression because the officer didn't preserve the evidence of the video." The district court allowed Martin to proceed, but inquired, "Is there testimony that [the video] ever existed? You said it was destroyed." Martin then asked Jennings the following:

Q:  Well, are the cameras automatically—you turn on your overhead lights and the cameras come on?

A:  Yes, sir.

Q:  So there would have been a video made of this particular stop and Mr. Martin being extracted from the vehicle, correct?

A:  Yes, sir, if it worked.

Q:  And would we know if it worked by the preservation of the tape, or the Hi8 tape, or whatever it would have been?

A:  It would have been preserved if I marked it as evidence, if I believed it was evidence at the time. By looking at my report, I believed it had no evidential value so I saw no reason to mark it as evidence.

Q:  What does the sheriff's department policy say about preserving tapes?

A:  If it has evidence on it.

Q:  Well does it not say that all tapes are to be preserved for 30 days, regardless of whether they have evidence on them?

A:  Yes, sir. If they'd like me to clarify, I will.

Q:  Sure.

A:  We're able to make that decision on whether or not the tape is to be saved for evidence or not. All our videotapes, once at the end, we turn them in to our supervisors. And our supervisors at the time place them in a secure room, and they are stored there for the 30 days, like it [is] required. And what they

4

did with it after that, I have no clues because, once I turn it in, it's out of my hands.

. . . .

Q: When you—you end the shift—or at least on patrol units—you take the video out of the camera and turn it in?

A: No, sir.

Q: What do you do with it?

A: It stays in the unit . . . unless it runs out, and then it's taken out and given to the supervisor.

Q: You mean . . . if the tape empties, if it's completely full, you put in a new blank tape and give the old one to the supervisor?

A: Yes, sir, unless—like I said . . . if I believed it had any type of evidential value, then it would have been marked right then and there.

. . . .

Q: Okay. And so . . . how often would [the camera] not function?

A: With those, if it's the one that I think I had at the time, the weather played a role, the humidity played a role, all kinds of things played a role. We had a lot of problems with our videotapes, and still do.

Q: Okay. So did you know whether or not this video was working that evening?

A: I don't recall, sir.

. . . .

Q: Okay. But you're supposed to check it before you start your shift and at the end of your shift, are you not, sir?

A: Yes, sir.

Q: And you have no notation in your file that you determined that this video was not working on this evening?

5

A:      No, sir, I don't.

On cross-examination, the State elicited additional testimony from Jennings on this issue:

Q:      . . . . My question is this:  Do you recall if the video camera in the vehicle that you were in on the [date of the offense] was working?

A:      No, sir, I do not.  I wish I could.

. . . .

Q:      —[Y]ou stated that [the video] remains in the vehicle; is that right?

A:      Yes, sir.

Q:      Okay.  And if it remains in the vehicle and it's not taken out, what happens to that video?

A:      The [video]—remains in the vehicle until it runs out, and then it's replaced with a new tape.

Q:      Okay.  My question is, is there any way that it stays in the vehicle and it's just taped over?

A:      No, sir.  It . . . can't be retaped over while it's inside the vehicle.

Finally, on redirect, the following testimony was elicited:

Q:      But, at the end of the shift, you turn in the tape?

A:      No, sir.

Q:      At the end, when the tape is used up, then you turn it in?

A:      Yes, sir.

Q:      What if it's not at the end of the shift, what if [it's] at the beginning?  Say it's an hour into the shift, what do you do?  Get a replacement tape?  And you put

6

it in there, and then . . . the tape gets full, and then you give it to your supervisor?

A:     Yes, sir. We call our supervisor and let him know that the video is full and meet up with them and exchange tapes.

Q:     But, apparently, your opinion is . . . that if you feel that it doesn't have evidentiary value, you don't have to turn it in or you don't have to preserve it, or whatever, correct?

A:     Yes, sir, that was my understanding at the time.

Q:     So it's very possible that . . . you just decided in your mind that it didn't have any evidential value, that . . . you didn't preserve the video?

A:     Yes, sir.

Q:     And the only way to know if there was a video that properly recorded the events of that evening would be if you had preserved that video, correct?

A:     Yes, sir.

Following Jennings's testimony, the proceedings were recessed. When the hearing was continued on a later date, Martin presented additional evidence "on the issue of how subpoenas and letters get delivered to the correct people." Michael LaSorsa, a paralegal with the Travis County Sheriff's Office, testified that when he receives a subpoena, he "figure[s] out who the named person is," scans the subpoena into a computer scanner, and then sends an email to that person with the subpoena as an attachment. Although LaSorsa recognized the 2009 subpoena, he did not have a record of the 2008 subpoena, which was apparently issued before he began working at the office. However, LaSorsa testified that he had no knowledge that the procedures for delivering subpoenas were different in 2008 than they were in 2009.

7

Alonzo White, a Travis County mail clerk who had signed for the certified letter that was addressed to Jennings, testified that he picks up mail from the post office, stamps the mail with his name if it is certified, logs it into "our log sheet," and then gives it to his supervisor. The supervisor also logs in the certified mail and then gives it to a mail carrier, who delivers it to the individual named in the address. White testified that the letter addressed to Jennings "should have been" delivered, but he did not know if it had been because "[a]fter we log it, it's out of our hands."

Finally, Martin took the stand and testified as to his recollection of the night in question. Martin was unsure of whether he had failed to use his turn signal as Jennings had claimed. He testified, "I think I turned it on but it didn't work at that time." When asked if his taillights had worked that evening, he answered, "I believe that they did but the switch had gone bad." Martin also provided testimony regarding the search of his person and his subsequent arrest.

At the conclusion of the hearing, Martin argued that "the officers intentionally destroyed the video and thereby put[] exculpatory evidence as far as the search is concerned or evidence favorable to the accused out of the reach of the accused. We feel that for no other reason the search is invalid and any evidence found as a result of that search should be suppressed." The district court took the matter under advisement, and later denied the motion to suppress. Martin then pleaded guilty to the charged offense and was placed on deferred adjudication. This appeal followed.

## STANDARD OF REVIEW

A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). The trial court is given almost complete deference in its determination of historical facts, especially if those are based on

an assessment of credibility and demeanor. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor. *Montanez v. State*, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006). However, for mixed questions of law and fact that do not fall within that category, a reviewing court conducts a de novo review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007).

At the suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, the trial court may choose to believe or to disbelieve all or any part of the witnesses' testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Unless the trial court abuses its discretion by making a finding unsupported by the record, we defer to the trial court's findings of fact and will not disturb them on appeal. *Miller v. State*, 335 S.W.3d 847, 854 (Tex. App.—Austin 2011, no pet.). When the trial court fails to make explicit findings of fact, we imply fact findings that support the trial court's ruling so long as the evidence supports these implied findings. *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).

**ANALYSIS**

In his first issue, Martin asserts that the district court abused its discretion in denying his motion to suppress because, in Martin's view, "the destruction of the video recording of the stop containing exculpatory evidence" violated his due process rights under the United States Constitution. *See* U.S. Const. amends. V, XIV. In response, the State argues that the recording did

9

not contain exculpatory evidence and that, even if it did, the police "did not act in bad faith by not preserving the videotape."

We agree with the State that the record supports a finding by the district court that the police did not act in bad faith. The United States Supreme Court has held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). "'Precisely what constitutes 'bad faith' is not clear.'" *Ex parte Napper*, 322 S.W.3d 202, 231 (Tex. Crim. App. 2010) (quoting George E. Dix and Robert O. Dawson, 42 Texas Practice, 2nd ed., § 22.63 (2001)). However, it is "more than simply being aware that one's action or inaction could result in the loss of something that is recognized to be evidence." *Id*. at 238. "[B]ad faith entails some sort of improper motive, such as personal animus against the defendant or a desire to prevent the defendant from obtaining evidence that might be useful." *Id*. When police conduct "can at worst be described as negligent," the failure to preserve evidence does not rise to the level of a due process violation. *Youngblood*, 488 U.S. at 58.

In this case, the district court would not have abused its discretion in finding that the police conduct did not rise to the level of bad faith. First, there was evidence that the existence of any recording for police to preserve was speculative. Jennings testified that he had "no clue" whether his video camera was working on the night of the traffic stop. He added, "We had a lot of problems with our videotapes, and still do." When asked by the State on cross-examination if he recalled whether the video camera was working on the night in question, Jennings answered, "No, sir, I do not. I wish I could." The district court would not have abused its discretion in crediting

10

Jennings's testimony and finding that the State's inability to produce a recording was possibly due to Jennings failing to ensure that his video camera was working properly on the night in question.

Furthermore, even if there was a recording, the district court would not have abused its discretion in finding that the apparent failure to preserve it was not due to any bad faith on the part of the police. Although Martin characterizes the police conduct as "destruction of the videotape," the record supports a finding by the district court that this is not what actually occurred. In fact, Jennings testified that the video "can't be retaped over while it's inside the vehicle." Instead, according to Jennings, the video "remains in the vehicle until it runs out, and then it's replaced with a new tape." If the tape "runs out" during an officer's shift, Jennings explained, "We call our supervisor and let him know that the video is full and meet up with them and exchange tapes." Jennings also testified, "All our videotapes, once at the end, we turn them in to our supervisors. And our supervisors at the time place them in a secure room, and they are stored there for the 30 days, like it [is] required. And what they did with it after that, I have no clues because, once I turn it in, it's out of my hands." There is no indication in the record that Jennings or his supervisors handled the videotape in question any differently than they handled other videotapes. Nor is there any indication in the record that the tape was not preserved because of any improper motive on the part of Jennings or other officers. *See Mahaffey v. State*, 937 S.W.2d 51, 53 (Tex. App.—Houston [1st Dist.] 1996, no pet.).

Martin places significance on Jennings's testimony that he did not mark the tape as evidence because Jennings had made a determination that it did not have "any type of evidential value." According to Martin, this is evidence of bad faith. On this record, however, the district court

11

would not have abused its discretion in finding otherwise. Jennings provided no testimony suggesting that his decision to not mark the tape as evidence was done for a bad-faith purpose. At worst, Jennings's testimony is evidence of negligence. For example, the district court could have reasonably inferred that if the video camera was not working properly at the time of the stop, which Jennings testified was a possibility, it might not have properly recorded the traffic stop and arrest. Thus, Jennings might have determined that the recording had no "evidential value" for that reason. The district court would not have abused its discretion in finding that such a determination would not rise to the level of bad faith. *See Lovitt v. True*, 403 F.3d 171, 187 (4th Cir. 2005) (holding that although there may have been "a serious error in judgment" in failing to preserve evidence, "there existed no evidence of bad faith on anyone's part").

Martin also argues that failure to follow police procedure is evidence of bad faith. *See McGee v. State*, 210 S.W.3d 702, 704 (Tex. App.—Eastland 2006, no pet.). However, it is not *necessarily* evidence of bad faith; it could just as easily be evidence of negligence. *See United States v. Garza*, 435 F.3d 73, 76 (1st Cir. 2006) (no bad faith even though "it was not the 'normal' procedure to destroy evidence in cases that were still open"); *United States v. Deaner*, 1 F.3d 192, 200 (3d Cir. 1993) ("While a showing that the government did not follow standard procedure could provide some evidence of bad faith, we have not held that an improper procedure in and of itself implies bad faith. While it may permit such an inference, it does not syllogistically imply the presence of bad faith as a matter of deductive logic."). Moreover, the district court could have found that in this case, police procedures were not necessarily violated. Jennings testified that although police procedures require the videotapes to be preserved for 30 days in all cases, it also

allows officers "to make that decision on whether or not the tape is to be saved for evidence or not." The district court could have reasonably inferred from this testimony that there is a department policy giving officers discretion to determine whether the tapes have evidentiary value and that Jennings did not violate that procedure by determining that the videotape in this case did not.[1]

Finally, Martin argues that bad faith can be inferred from the failure of the department to comply with either the subpoenas that were issued or the letter that Martin wrote requesting preservation of the evidence. Regarding the letter, the district court would not have abused its discretion in crediting Jennings's testimony that he had not seen it prior to the suppression hearing, particularly in light of Alonzo White's testimony that he did not know if the letter had been delivered to Jennings. Regarding the subpoenas, Jennings acknowledged being served with the subpoena that was directed to him in October 2009. But this was well beyond the time period required to preserve the videotape, and the district court would not have abused its discretion in finding that failing to preserve the videotape beyond that period was not evidence of bad faith. As for the subpoena that was issued in September 2008, it was directed to the "Travis County Sheriff's Custodian of Records," not Jennings. Martin produced no evidence of who specifically received this subpoena. Michael LaSorsa, the paralegal who handles subpoenas for the Travis County Sheriff's Office, had no knowledge of how the September 2008 subpoena was handled or who received it, and no other witness provided testimony on the subject. On this record, the district court would not have

---

[1] We note that the record is not entirely clear on the specific procedures the department has established regarding the preservation of videotapes. Although a copy of the "Travis County Sheriff's Office Policies and Procedures" regarding "Mobile Video Taping" was admitted into evidence as Defense Exhibit 2, only the first page of this three page document has been included in the reporter's record of the proceedings.

abused its discretion in finding that the apparent failure of Jennings and others in the department to preserve the evidence as requested in the letter and the subpoenas was not due to bad faith. *Cf. Illinois v. Fisher*, 540 U.S. 544, 548 (2004) ("We have never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police."). Moreover, even if this was some evidence of bad faith, the district court would not have abused its discretion in finding that it was outweighed by other evidence in the record, discussed above, tending to show, at worst, negligence. *See United States v. Smith*, 534 F.3d 1211, 1224-25 (10th Cir. 2008) (listing several factors that courts may consider when determining whether government acted in bad faith). Because the record supports a finding that the police did not act in bad faith, we cannot conclude that the district court abused its discretion in denying the motion to suppress on federal due process grounds. We overrule Martin's first issue.

In his second issue, Martin asserts that the State's failure to preserve the recording violated his rights under the Due Course of Law provision of the Texas Constitution. *See* Tex. Const. art. I, § 19. Citing to the decision of the Waco Court of Appeals in *Pena v. State*, Martin argues that the Texas Constitution provides greater protection on this issue than the United States Constitution. *See* 166 S.W.3d 274, 281-82 (Tex. App.—Waco 2005), *vacated*, 191 S.W.3d 133, 145-46 (Tex. Crim. App. 2006), *on remand*, 226 S.W.3d 634, 655 (Tex. App.—Waco 2007), *rev'd on other grounds*, 285 S.W.3d 459 (Tex. Crim. App. 2009). However, this Court and the majority of Texas courts of appeals have repeatedly held that the Due Course of Law provision provides the same protection in this area of the law as the federal Due Process Clause. *See, e.g.*, *Salazar v. State*, 298 S.W.3d 273, 279 (Tex. App.—Fort Worth 2009, pet. ref'd); *State v. Vasquez*,

230 S.W.3d 744, 751 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *McGee*, 210 S.W.3d at 705; *Salazar v. State*, 185 S.W.3d 90, 92 (Tex. App.—San Antonio 2005, no pet.); *State v. Rudd*, 871 S.W.2d 530, 532-33 (Tex. App.—Dallas 1994, no pet.); *Saldana v. State*, 783 S.W.2d 22, 23 (Tex. App.—Austin 1990, no pet.). As this Court has previously explained, the reasoning of *Pena* "does not persuade us that we should depart from our holding in *Saldana* and the majority of our sister courts." *State v. White*, No. 03-07-00041-CR, 2010 Tex. App. LEXIS 6766, *25-26 (Tex. App.—Austin Aug. 19, 2010, no pet.) (mem. op. on remand, not designated for publication). Accordingly, for the same reasons that we overruled Martin's first issue, we overrule his second issue.

## CONCLUSION

We affirm the order of deferred adjudication.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   August 10, 2011

Do Not Publish

15