**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-6980

RONNIE WALLACE LONG,

Petitioner – Appellant,

v.

ERIK A. HOOKS, Secretary, NC Dep't of Public Safety,

Respondent – Appellee.

------------------------------

THOMAS ALBRIGHT, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; VALENA ELIZABETH BEETY, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; BARBARA E. BIERER, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; C. MICHAEL BOWERS, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; ARTURO CASADEVALL, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; JESSICA GABEL CINO, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; SIMON A. COLE, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; M. BONNER DENTON, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; SHARI SEIDMAN DIAMOND, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; RACHEL DIOSO-VILLA, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; JULES EPSTEIN, Professor and Director Vision Center Laboratory Conrad T. Prebys Chair in Vision Research Salk Institute for Biological Studies; DAVID L. FAIGMAN, Professor and Director Vision Center Laboratory,

Amici Supporting Appellant.

---

Appeal from the United States District Court for the Middle District of North Carolina at Greensboro. Catherine C. Eagles, District Judge. (1:16−cv−00539−CCE−LPA)

---

Argued: March 20, 2019                                   Decided: January 8, 2020

---

Before NIEMEYER, THACKER, and RICHARDSON, Circuit Judges.

---

Affirmed by published opinion. Judge Richardson wrote the majority opinion, in which Judge Niemeyer joined. Judge Thacker wrote a dissenting opinion.

---

**ARGUED:** Jamie Theodore Lau, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellant. Clarence Joe DelForge, III, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Theresa A. Newman, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina; G. Christopher Olson, Raleigh, North Carolina, for Appellant. Joshua H. Stein, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH CAROLINA, Raleigh, North Carolina, for Appellee. Karen A. Newirth, THE INNOCENCE PROJECT, INC., New York, New York; Breon S. Peace, Matthew Aglialoro, Willam Segal, CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, for Amicus The Innocence Project, Inc. Brandon L. Garrett, L. Neil Williams Professor of Law, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina; Mark D. Harris, Adam W. Deitch, PROSKAUER ROSE LLP, New York, New York, for Amici Curiae.

RICHARDSON, Circuit Judge:

Ronnie Wallace Long is serving two life sentences after a North Carolina jury convicted him of rape and burglary in 1976. Long has filed a second application for a federal writ of habeas corpus. In it, he claims that a state post-conviction court unreasonably applied *Brady v. Maryland*, 373 U.S. 83 (1963), when evaluating evidence disclosed to him for the first time thirty years after his trial. The district court disagreed and granted the state's motion for summary judgment.[1]

We affirm. Although Long shows the state court's summary conclusion misstated the burden of proof for *Brady* claims, that error does not entitle Long to habeas relief. To overcome the required deference to state courts, Long must show that *each reason* supporting the state court's decision is objectively wrong beyond any possibility for fairminded disagreement. *Wetzel v. Lambert,* 565 U.S. 520, 525 (2012); *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Here, the state court found "the cumulative [e]ffect of any [new evidence] with any value is so minimal that it would have had *no impact* on the outcome of the trial." J.A. 1359 (emphasis added). This reasonable finding adequately supports the state court's decision that any newly disclosed evidence falls short of the kind of materiality that *Brady* requires.

---

[1] The state is represented by Respondent-Appellee Eric Hooks, North Carolina's Secretary of Public Safety.

## I.     Background

### A.     The 1976 burglary, rape, and investigation

On April 25, 1976, at around 9:30 p.m., a man entered the home of 54-year-old (now deceased) widow Sarah Bost in Concord, North Carolina. He put a knife to her throat and demanded money. When Mrs. Bost could not find money in her purse, the man became angry, cursed her, threw her to the ground, ripped her clothes off, beat her, and raped her. The man repeatedly ordered Mrs. Bost not to look at his face, but she defied him in hope that she could identify her attacker if she survived.

During the assault, the phone rang and startled the man. He pulled up his pants and went out the front door. Mrs. Bost ran unclothed out the back door to her neighbor's house. Once there, she told her neighbor that an African-American man had just raped her. The neighbor brought Mrs. Bost inside and called the police.

Concord Police Department officers investigated the attack. They gathered evidence from the scene and interviewed Mrs. Bost, who told them that she was "attacked and raped by a black male wearing a leather coat, toboggan, and [] gloves." J.A. 1429. She described her attacker as around five foot five inches to five foot nine inches tall, with a "slender build and slim hips" and a thin mustache. J.A. 1428; *see also* J.A. 200–1, 305. She also said that he wore blue jeans and used "correct [E]nglish and at times spoke very softly" with no noticeable accent. J.A. 1428. An ambulance then took Mrs. Bost to a local hospital.

At the hospital, Mrs. Bost was examined by Dr. Monroe, a physician specializing in gynecology. Dr. Monroe observed extensive scratches, bruising, and lacerations from Mrs.

4

Bost's face to her legs. He also noted her "fingernails looked like they had been traumatized, or nearly bent backwards." J.A. 295. As part of a pelvic exam, Dr. Monroe assembled a microscope slide of vaginal fluid that revealed an "extremely high count of live, very active, human spermatozoa[]." J.A. 296. Mrs. Bost remained at the hospital for five days for observation and treatment.[2]

The day after the rape, officers showed Mrs. Bost a photographic lineup of thirteen male suspects, hoping she might identify her attacker. She did not identify a suspect from these photographs, which did not include a picture of Long.

Less than two weeks later, officers asked Mrs. Bost to go to the local courthouse to observe the proceedings. The Concord Police had learned about a similar burglary and rape in Washington, D.C. In that case, the victim found Long's Social Security card in her apartment after the attack. Based on the card left behind, the Washington Metropolitan Police sought Long, a Concord resident, for questioning.

Having asked Mrs. Bost to come to Court, officers informed Mrs. Bost that the man who raped her may, or may not, be present in court and that she should discretely notify them if she identified him. The officers also told her that she may have to come to court on two or more occasions. She was also asked to bring a neighbor or friend and to wear a disguise. At first reluctant, Mrs. Bost agreed.

Mrs. Bost arrived at the courthouse on the morning of May 10, 1976, wearing a red wig and glasses. Accompanied by her neighbor, she sat in the second row, while two

---

[2] At trial, the defense chose not to cross-examine Dr. Monroe.

officers sat away from them. According to the officers, there were "approximately 60 to 65 persons in the court room either in the audience or persons on trial," with "12 adult black males in the general age group" of the description given by Mrs. Bost. J.A. 1433. As Mrs. Bost observed the proceedings, several cases were called involving African-American men as defendants.

After about a half hour, Ronnie W. Long's case was called. Long, "wearing a medium brown leather coat, a l[ei]sure shirt flowered, no hat, [and] dress pants," exited the row of seats to the left side of the gallery and "walked around to the defense table where he was readily visible by Mrs. Bost." J.A. 1433. Mrs. Bost notified the officers that she had identified her attacker, telling them that "there was no doubt in her mind that this person Ronnie W. Long was the person who entered her house." J.A. 1433; *see also* J.A. 314–15 ("I will never forget his profile, the coloring of his skin . . . . Another reason, his mannerisms and the way he walked. . . . I knew his voice. . . . One thing I will never forget, the way he talked to me. . . . Another way I identified him was the way he carried himself."). Officers took her to the police station, where she again identified Long in a photographic lineup.

After Mrs. Bost identified Long as her rapist, the officers asked him to come to the police station. Long drove himself to the station, where he waived his rights and permitted a search of his car. The search revealed a pair of black gloves over the visor, a green toboggan under the driver's seat, and several matchbooks. The officers seized these items, as well as Long's leather jacket. One of the officers, Officer Isenhour, took impressions of the bottoms of Long's shoes. Long was arrested and charged with burglary and rape.

6

**B.     Long's trial**

Long's trial began in Cabarrus County Superior Court in September 1976.  On the first day, Long's trial counsel moved to suppress Mrs. Bost's courthouse and photographic identifications, arguing that they were impermissibly tainted by the officers' actions.  After permitting the parties to question Mrs. Bost outside the presence of the jury, the court denied Long's motions.

In its case in chief, the State called Mrs. Bost along with her examining physician and several law enforcement officers.  Mrs. Bost identified Long as her attacker, pointing to him in the courtroom.  Long's defense had several components.  First, he sought to impeach Mrs. Bost's testimony on the grounds that cross-racial eyewitness identification is often suspect.  Second, the defense pointed to the lack of any physical evidence tying him to the crime scene.  Third, Long introduced testimony about his whereabouts on the evening of the crime to establish an alibi.[3]

The jury convicted Long of both burglary and rape.  He was sentenced to two life terms in prison, and his conviction was affirmed on direct appeal by the Supreme Court of North Carolina.  *North Carolina v. Long*, 237 S.E.2d 728 (N.C. 1977).

---

[3] Along with testimony about his activities earlier in the day and after the attack, Long's mother testified that he returned home at 8:30 p.m. and went upstairs until around 10:30, when he left.  She also explained that, while upstairs, he spoke with his girlfriend and two-year-old son by phone.  She testified that part of the call took place shortly after 9:00 (around the time of the crime), when she picked up the phone in the kitchen to talk with Long's two-year-old son for five or ten minutes.  *See* J.A. 475–76; *see also* J.A. 468 (Long's girlfriend describing the same call).

## C.    Disclosure of new evidence

In the years that followed, Long filed unsuccessful post-conviction petitions in state and federal court, including a 28 U.S.C. § 2254 federal habeas application. *North Carolina v. Long*, 377 S.E.2d 228 (Mem.) (N.C. 1989); *Long v. Dixon*, Civ. No. C-89-278-S (M.D.N.C. May 3, 1990). Then, in 2005, he moved in state court for location and preservation of evidence, seeking any biological evidence to use in DNA testing and the pieces of clothing recovered, such as his black leather jacket and green toboggan. The judge granted Long's motion, ordering the prosecution and law enforcement to locate and preserve all evidence related to his case.

The order led to the disclosure of dozens of documents falling into three groups: (1) State Bureau of Investigation forensic reports documenting the testing of physical evidence; (2) the Master Case File on the investigation; and (3) excerpts of Mrs. Bost's medical records from her hospitalization.

### 1.    Forensic test reports

The State disclosed copies of reports and handwritten notes from forensic tests conducted on evidence delivered to the lab by Officer Isenhour. The reports revealed that analysts (1) compared the single hair found at the crime scene with Long's head and pubic hair samples and concluded that they did not match, noting that no additional hairs were found on Mrs. Bost's clothing, J.A. 1466; (2) examined Long's leather jacket, gloves, and toboggan and did not find any trace of paint or carpet fibers matching samples taken from Mrs. Bost's home, J.A. 1454–55; (3) compared five matchbooks from Long's car with three burned matches recovered from the upstairs windowsill and found insufficient

8

evidence to conclude that they were linked, J.A. 1463; and (4) compared a latent shoeprint recovered from the front porch bannister of Mrs. Bost's home with the inked impressions of Long's shoe bottoms, concluding that Long's shoes could have made the shoeprint, but there was insufficient information for a definite match, J.A. 1464. The testing of the hair, clothing, and matchbooks was not disclosed to Long's defense counsel before trial.

### 2. Master case file documenting evidence submitted for forensic testing

The Master Case File contained two "Request[s] For Examination of Physical Evidence," each written by Officer Isenhour to document items of evidence he delivered for forensic testing the day after Long's arrest. J.A. 1451, 1465.

The first request listed the latent shoeprint taken from outside Mrs. Bost's house and inked impressions of Long's shoes. *See* J.A. 1465. It asked the forensic analysts to "[e]xamine for identification from latent lift to known shoe-bottom impressions." J.A. 1465.

The second request listed 13 additional items of evidence provided for forensic testing, including Long's leather jacket, green toboggan, and leather gloves; paint and carpet samples taken from the crime scene; samples of Long's and Mrs. Bost's head and pubic hair; a "suspect hair from the scene"; matchbooks from Long's car; burned matches obtained from the upstairs windowsill; and Mrs. Bost's clothing. J.A. 1454. It requested the examination of Long's clothing "for the presence of paint and fibers" and to compare any paint or fibers found with the samples taken from Mrs. Bost's home. *Id*. It also requested a forensic comparison of the hair found at the scene (and any hairs found on Mrs.

9

Bost's clothing) with the hair samples taken from Long as well as a comparison of the burned matches from the windowsill with the matchbooks recovered from Long's car.

Neither request was disclosed to Long's counsel before trial. Moreover, at trial, Isenhour offered an incomplete picture of the testing he had requested. While he testified to delivering the shoeprints for testing, he also said that the black leather jacket, the green toboggan, and black leather gloves remained in his "custody and control" since he received them from another officer during the investigation. J.A. 415–16.

### 3. The victim's medical records and biological evidence

The county hospital produced to the superior court judge 26 pages of Mrs. Bost's medical records from her hospitalization and medical examination hours after the rape. After *in camera* review, the judge authorized the release of 11 pages of the records to Long's post-conviction counsel.

The released records showed that Dr. Monroe collected biological evidence of the rape in accordance with the hospital's rape protocol: he prepared slides of live spermatozoa, took two swabs of vaginal secretions that he placed in test tubes, and obtained pubic combings. After the examination, the records show that the hospital released pubic hair and one of the test tubes to an officer after authorized by Mrs. Bost. J.A. 1475–79. These records were not disclosed to Long's defense counsel. Efforts to locate any biological evidence in 2007 were unsuccessful.

### D. State post-conviction proceedings

After receiving the new evidence, Long filed a Motion for Appropriate Relief ("MAR") (North Carolina's version of a habeas petition), raising (1) an allegation that the

10

state failed to disclose exculpatory material to the defense in violation of the Due Process Clause, the North Carolina Constitution, and *Brady*, and (2) a newly discovered evidence claim under state law. After an evidentiary hearing, the state court denied Long's motion, finding that both of Long's claims failed. An equally divided Supreme Court of North Carolina affirmed. *North Carolina v. Long*, 705 S.E.2d 735 (N.C. 2011).

After the state denied relief, Long filed another federal habeas application in 2012. But because he had failed to receive pre-filing authorization from this court as required by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), the district court dismissed Long's application for lack of jurisdiction. *See Long v. Lancaster*, No. 1:12-CV-119, 2012 WL 3151179, at *1 (M.D.N.C. Aug. 2, 2012). Long neither appealed nor sought the necessary pre-filing authorization.

Then, in 2015, Long participated in the North Carolina Innocence Inquiry Commission's Postconviction DNA Testing Assistance Program. Those efforts revealed 43 latent fingerprints taken from the crime scene that had not been disclosed. Testing excluded Long as the source of those prints.

Long returned to federal court and requested pre-filing authorization for a successive federal habeas application, which we granted. *See In re Ronnie Long*, No. 16-295, Dkt. 6 (4th Cir. May 24, 2016). Long then filed the application at issue here. The district court at first dismissed Long's application after finding that it presented, along with the *Brady* claims, an unexhausted claim involving the latent fingerprints taken from the crime scene and disclosed in 2015. *See Long v. Perry*, No. 1:16CV539, 2016 WL 7235779

11

(M.D.N.C. Dec. 14, 2016). We reversed and remanded to the district court, finding that Long had "unequivocally disclaimed" his latent fingerprint claim. *Long v. Perry*, 699 F. App'x 260, 261 (4th Cir. 2017).

Without the fingerprint claim, Long's application relies solely on his argument that "the MAR Order was contrary to, or an unreasonable application of, the Supreme Court's clearly established *Brady* jurisprudence with respect to each of the three fundamental *Brady* components." J.A. 46. The state moved for summary judgment on procedural and merits grounds, and the matter was referred to a magistrate. In a 66-page report and recommendation, the magistrate found on the merits that the state court's application of *Brady* to the newly discovered evidence was reasonable. The district court adopted the magistrate's report and recommendation and granted summary judgment to the Respondent. Long timely appealed.

## II. Discussion

We review the district court's decision de novo. *Muhammad v. Kelly*, 575 F.3d 359, 367 (4th Cir. 2009). And we "examine [Long's] argument through the dual lens of the AEDPA standard and the standard set forth by the Supreme Court in *Brady*." *Richardson v. Branker*, 668 F.3d 128, 144 (4th Cir. 2012).

Under AEDPA, a federal court "shall entertain" a habeas application for a person in state custody "in violation of the Constitution or laws or treaties of the United States." § 2254(a). Although a violation of federal law is necessary for a writ to issue, it is not sufficient—"AEDPA demands more," *Harrington v. Richter*, 562 U.S. 86, 102 (2011), "consistent with the respect due state courts in our federal system," *Miller-El v. Cockrell*,

12

537 U.S. 322, 340 (2003). State courts "possess sovereignty concurrent with that of the Federal Government . . . and are thus presumptively competent[] to adjudicate claims arising under the laws of the United States." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Recognizing this "foundational principle of our federal system," AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013).

ADEPA properly respects the central role of state courts by limiting the "federal courts' power to issue a writ to exceptional circumstances." *Richardson*, 668 F.2d at 138. In our review, we must remain ever mindful that state courts "are the principal forum for asserting constitutional challenges to state convictions, [and] that habeas corpus proceedings are a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 132 (quoting *Richter*, 562 U.S. at 103) (internal quotation marks omitted).

Under ADEPA's deferential framework, we may grant relief for a habeas claim adjudicated on the merits in state court for only two reasons. *See* § 2254(d). If the state decision turns on a factual determination, that determination must be "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; § 2254(d)(2). Otherwise, the earlier state decision must have been contrary to or involve an unreasonable application of, clearly established federal law.

13

§ 2254(d)(1); *see Virginia v. LeBlanc*, 137 S.Ct. 1726, 1728–29 (2017).[4]   Here, the applicable federal law consists of the rules for determining whether the state violated a defendant's Fourteenth Amendment Due Process rights under *Brady*.

The state violates *Brady* when the prosecution fails to disclose *material* evidence favorable to a criminal defendant.  373 U.S. at 87; *Kyles v. Whitley*, 514 U.S. 419, 432 (1995).  Evidence is material if it creates a "reasonable probability of a different result," *Kyles*, 514 U.S. at 434, thus "undermin[ing] confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).  It is not enough for the withheld evidence to create the *possibility* of a different verdict; a different result must be reasonably *probable*. *Strickler v. Greene*, 527 U.S. 263, 291 (1999); *United States v. Agurs*, 427 U.S. 97, 109–

---

[4] While the standard for satisfying § 2254(d) is demanding, Petitioner faces an even greater hurdle were his claim to proceed.  Because Long brings a second habeas application, his claims "shall be dismissed unless—"

(A)   he "relies on a new rule of constitutional law" made retroactive by the Supreme Court; or

(B)   the factual predicate for his claim could not be previously discovered through the exercise of due diligence; *and* Long "establish[es] by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found [him] guilty of the underlying offense."

§ 2244(b)(2); *see United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003).  Below, the decision assumed Long satisfied this requirement and denied relief under § 2254(d).

While we "decline to dictate . . . any strict [habeas] methodology" to the district court, *Bell v. Jarvis*, 236 F.3d 149, 162 n.10 (4th Cir. 2000), we wonder why the decision below focused on the less-stringent *Brady* standard.  *Brady* requires Long to show a reasonable probability that a jury would find him innocent given the new evidence.  In contrast, § 2244(b)(2) requires Long to *clearly and convincingly* show that *any* reasonable factfinder *must* find him innocent—and the § 2244(b) determination is logically and procedurally antecedent to § 2254(d)'s remedial inquiry.

10 (1976); *see also Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").[5]

## A.     The state court's conclusions

Based on the evidence before it, the state court made the following "conclusion of law":

> As to the cumulative [e]ffect of the items of evidence the defense alleges they did not receive, this court finds, based on the findings of fact and conclusions of law stated herein, that the contents of several of the items the defense alleges they did not receive were fully addressed in front of the jury; that other materials contained in reports were more favorable to the State's case than the defendant's; and that any remaining matters that were not presented to the jury were of little or no value to the case as a whole; *and that the cumulative [e]ffect of any items with any value is so minimal that it would have had no impact on the outcome of the trial.*

J.A. 1358–59 (emphasis added).  The court's determination compels a specific outcome under *Brady*:  if evidence has *no impact* on the trial outcome, then it must leave no *reasonable probability* of a different result.  On this basis, the state court's decision that no *Brady* violation occurred adheres to controlling Supreme Court precedent.  *See Strickler*, 527 U.S. at 291.

But Long instead asks us to scrutinize the summary conclusions of the state court. Pet'r's. Br. 26 (citing J.A. 1359 ¶17).  After determining the evidence would have "no impact," the state court "in summary" writes:

> The Defendant has failed to prove by a preponderance of the evidence that his due process rights have been violated under *Brady*, in that he has not shown by a preponderance of the evidence that the claimed evidence was

---

[5] Only the state court's materiality determination is on appeal.

15

> withheld by the state, that it was exculpatory, or that the result likely would have been different with the claimed evidence.

J.A. 1359 (citations omitted). As the Petitioner argues, this summary conclusion incorrectly articulates *Brady*'s burden of proof. *Brady* requires that the defendant show that there is a reasonable probability that a jury would find him innocent, given the new evidence. It does not require "demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Because the state court's conclusion imposed a preponderance burden, it directly contradicts Supreme Court precedent.[6]

This inaccuracy alone does not make the state court's decision unreasonable. If another ground provided by the state court can sustain its decision, this error is "beside the point." *Wetzel v. Lambert*, 565 U.S. 520, 524 (2012); *cf. Woodford v. Visciotti*, 537 U.S. 19, 23–24 (2003) (inconsistent descriptions of the burden of proof did not make the state court's decision unreasonable under AEDPA). In *Wetzel*, the Supreme Court held that we may only disturb the state court's judgment if "*each* ground supporting the state court decision is examined and found to be unreasonable." 565 U.S. at 525. Because the state

---

[6] The state argues that the preponderance language refers to the evidentiary standard in a North Carolina MAR hearing: "the moving party has the burden of proving by a preponderance of the evidence every fact essential to support the motion." N.C.G.S. § 15A-1420(c)(5); Resp't Br. 18–19. This reading may explain the court's reference to a preponderance in its factual determinations. *See, e.g.*, J.A. 1359 (determining, under a preponderance standard, the defendant did not prove that the state failed to disclose forensic reports). But it is different to say—twice in the same sentence—that the defendant must prove, under *Brady*, the *likelihood of a different outcome* by a preponderance of the evidence.

16

court's no impact conclusion is "sufficient" to reject Long's claim, "it is irrelevant that the court also invoked [an improper] ground." *Parker v. Matthews*, 567 U.S. 37, 42 (2012); *see also Littlejohn v. Trammell*, 704 F.3d 817, 831 (10th Cir. 2013).

The dissent asserts *Wetzel* applies only if a proper reason for the state court's decision can be "isolated from" another improper reason so as to be entirely "separate[]." Dissent at 30, 32. This mandate goes too far—the Supreme Court tells us when this kind of an 'adequate and independent' examination is necessary. *See Coleman v. Thompson*, 501 U.S. 722, 732–33 (1991). And in *Wetzel*, the grounds supporting the Pennsylvania Supreme Court's decision were not so isolated as the dissent here demands.[7] There, the petitioner—convicted of murder, robbery, and other offenses at trial—argued the Commonwealth violated *Brady* when it failed to disclose a police "activity sheet" that supposedly identified another participant in the robbery. *Wetzel*, 565 U.S. at 521. According to petitioner, the activity sheet was exculpatory and would have impeached one of the Commonwealth's primary witnesses. *Id.* at 521–22. The state court disagreed, finding that the activity sheet was "'not exculpatory or impeaching' but instead 'entirely ambiguous.'" *Id.* at 524 (citations omitted). "Moreover," the state court continued, the

---

[7] Indeed, the Supreme Court has characterized *Wetzel* as a *sufficiency* inquiry, not a complete *separateness* inquiry. *See Parker*, 567 U.S. at 42 ("That ground was sufficient to reject [Petitioner's] claim") (citing *Wetzel*, 132 S.Ct. at 1198); *see also Littlejohn*, 704 F.3d at 831 (explaining that *Wetzel* requires "a sufficient substantive ground."); *cf. Blackston v. Rapelje*, 780 F.3d 340, 354 (6th Cir. 2015) (noting the state court's rationales "overlap," and continuing to analyze each pursuant to *Wetzel*). And this approach makes good sense under AEDPA—where the state court provides a sufficient and proper reason to support its judgement, that decision does not result from an unreasonable application of federal law. *See* § 2254(d)(1).

17

contents of the activity sheet would be cumulative to other impeachment evidence. *Id.* These rationales supporting the state court's conclusion were neither "isolated from" one another nor entirely separate—on the contrary, both turned on an assessment of the contents of the activity sheet. *See Commonwealth v. Lambert*, 884 A.2d 848, 855–56 (Pa. 2005).

Nevertheless, the Supreme Court held that the Third Circuit erred when it granted the writ based on its disagreement with the state court's assessment of the impeachment value of the activity sheet. *Wetzel*, 565 U.S. at 523. As the Supreme Court explained, if the state court reasonably found the activity sheet to be ambiguous, then the court's conclusion about the impeachment value of the sheet did not matter. *Id.* After all, an "ambiguous" document is neither exculpatory nor impeaching.

Here, the unqualified conclusion that the new evidence has 'no impact' logically precedes the erroneous preponderance determination. *Wetzel* teaches that if the 'no impact' conclusion—which alone is sufficient to reject Petitioner's argument—is reasonable, "whatever [the state] courts had to say" in another conclusion "is beside the point." 565 U.S. at 524. And in our deferential review of state court reasoning, *see Richter*, 562 U.S. at 103, we should not jump to conclude that erroneous reasons or statements infect another sufficient reason.

### B. The state court's analysis

Of course, Long remains free to challenge the reasonableness of the state court's "no impact" conclusion, and he does. The state court assessed, separately and cumulatively, (1) the Forensic Testing Reports, (2) the Master Case File, and (3) the

18

biological evidence described earlier. As to these items, Long asserts the court "erroneously construed [their] value" and "ignored the value of impeachment evidence." Pet'r's Br. 25. In other words, Long asks us to dissect the judgment calls made by the state court.

We undertake this inquiry with the appropriate deference in mind. Again, under § 2254(d), we ask whether the state court's materiality assessment is objectively unreasonable based on the facts or an unreasonable application of established Supreme Court precedent. We must find the state court's decision reasonable "so long as 'fairminded jurists could disagree' on [its] correctness." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Before turning to their cumulative impact, we evaluate each item individually to identify its probative value. *See Kyles*, 514 U.S. at 436 n.10.

### 1. The forensic testing reports

Long claims that in failing to disclose these reports, the State "painted a picture of a very limited forensic investigation, when in fact the forensic investigation was extensive." Pet'r's. Br. 10. According to Long, the negative results reflected in the reports tend to prove his innocence. And he contends that the cumulative effect of the reports with negative findings "would have bolstered and supported the arguments his counsel made," such that "a jury would have been less likely to convict with each successive negative result." *Id.* at 37–38.

The state court discounted this evidence, and the state court's determination was not unreasonable. The absence of a match is "neither incriminating nor exonerating." *Case v.*

19

*Hatch*, 731 F.3d 1015, 1043 (10th Cir. 2013); *see also Gary v. Hall*, 558 F.3d 1229, 1257 (11th Cir. 2009). The state court took this view, explaining that the absence of evidence is not evidence of absence. *See* J.A. 1357–58; *cf.* P.E. Kish and H. L. MacDonell, *Absence of Evidence is not Evidence of Absence*, 46 J. FORENSIC IDENTIFICATION 160–64 (1996).

And, as Long and the state court acknowledge, the reports' conclusions about the hair, paint or carpet fibers, matchbooks, and shoeprint testing mirror the testimony at trial. *See* J.A. 1357 ("[T]he agent's testimony at trial was consistent with his report and the jury learned everything that was contained in the report yet found the defendant guilty of all charges."). In addition, cumulative evidence "is generally not considered material for *Brady* purposes." *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013). Thus, we cannot say that it was unreasonable for the state court to discount the reports of the forensic testing actually conducted.

### 2. The master case file

Long's Master Case File contained two documents about the forensic testing requested. The first is Officer Isenhour's request for analysts to conduct a forensic comparison of the latent shoeprint to Long's shoeprints. This document is material only inasmuch as it confirms law enforcement testimony that the State Bureau of Investigation conducted the analysis disclosed to the jury at trial. Thus, the first request is cumulative to what was presented at trial and, in any event, has no probative value in showing Long's guilt or innocence.

The second document lists 13 items of physical evidence for testing. Long concedes that the document itself does not suggest his guilt or innocence. Instead, he argues it

20

provides impeachment evidence because it shows that Isenhour's testimony "was false and concealed the true facts surrounding the evidence brought to the SBI lab." Pet'r's Br. 32. Contrary to the prosecution's representations at trial, *see* J.A. 416, it suggests that the physical evidence did not remain in Isenhour's custody at all time. Rather, he delivered the items to the State Bureau of Investigation. The state court discounted Isenhour's report because it "merely outlines the evidence collected and examined" in the lab reports. J.A. 1358.

In determining the materiality of impeachment evidence, we generally consider "the salience of the subject matter of the impeachment." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 561 (4th Cir. 1999). When impeachment evidence directly "relat[es] to the central issue" in the case, the prosecution's case suffers a "more serious blow." *Id.* Thus, we are more inclined to find that the evidence places the case in an entirely different light. *See id.*; *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998). For example, in *Giglio v. United States*, the Supreme Court considered whether the government's failure to disclose its promise not to prosecute a key witness in exchange for his testimony was material under *Brady*. 405 U.S. 150 (1972). In *Giglio*, the government's case depended "almost entirely" on one witness's testimony. *Id.* at 154. Because, that witness's credibility "was therefore an important issue in the case" and the impeachment evidence directly undermined that credibility, the Supreme Court remanded the case for a new trial. *Id.* at 154–55; *see Kyles*, 514 U.S. at 441 (finding suppressed evidence impeaching eyewitnesses to be material because "the essence of the State's case was the testimony of eyewitnesses, who identified Kyles as [the] killer") (internal quotation marks omitted).

21

In contrast, where suppressed impeachment evidence focuses on a peripheral issue, it generally fails to shed new light on the case as *Brady* requires. *See Turner v. United States*, 137 S.Ct. 1885, 1894 (2017) (evidence "too distant from the main evidentiary points" fails to create a reasonable probability of a different result as required by *Brady*); *United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010) (investigating officers dismissed for misconduct were not the only witnesses linking Petitioner with the crimes); *Gilday v. Callahan*, 59 F.3d 257, 272 (1st Cir. 1995). In *Strickler*, the Supreme Court analyzed whether suppressed documents providing grounds for impeachment of a government witness were material. 527 U.S. 263. Unlike in *Giglio*, the Petitioner's guilt in *Strickler* did not depend on the witness at issue, so the Court reasoned that undermining one witness did not create a reasonable probability of a different result at trial given the other persuasive evidence. *See id*. at 292–94.

Here, the impeachment value of the suppressed impeachment evidence does little to render the state court's conclusion unreasonable. In fact, we believe most reasonable jurists would consider the impeachment evidence peripheral. *Cf. Harrington v. Richter*, 562 U.S. 86, 101 (2011) (state court decision is reasonable "so long as 'fairminded jurists could disagree' on [its] correctness"). The impeachment of Isenhour would not change the substance of the reports at issue, which do not exculpate the Petitioner, do not undermine the state's theory at trial, and do not point to another perpetrator. The state's case—as Petitioner acknowledges—was built on Mrs. Bost's testimony, not Officer Isenhour's testimony. So impeachment of Mrs. Bost would place the case in a different light, but not

22

impeachment of Isenhour about his evidence handling and management of nonexculpatory reports.

### 3. Records showing the collection of biological evidence

Finally, we turn to the documents in Mrs. Bost's medical records. At trial, Long did not know that an officer took custody of one test tube containing biological evidence of the rape. Nothing in the record suggests this evidence was tested using the methods available in 1976.[8]

We agree with the state court's determination that the information is immaterial. As the state court noted: "The mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." J.A. 1358 (quoting *Agurs*, 427 U.S. at 109–10). And the Court found that "[t]here is no evidence that the materials collected from the victim's person were ever examined by the [State]." So the biological evidence was only "potentially useful" and, at least without bad faith, not material. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Lovitt v. True*, 403 F.3d 171, 186 (4th Cir. 2005).

Moreover, any impeachment value of the lack of testing was limited. In *United States v. Cole*, 293 F.3d 153, 163 (4th Cir. 2002), we explained that the suppression of

---

[8] Some forensic analyses common today—like DNA testing—did not exist at the time of this crime. The analysis of semen at the time could *only* identify a man's blood type *if* he secreted blood group antigens. *See* Pet'r's. Br. 39–40 n.10. Today, juries may expect precise forensic analyses of biological evidence, *see* Dissent at 39 ("Surely there is no evidence more material in a rape case than the assailant's semen."), yet we must take care not transplant those expectations where "modern forensic techniques . . . of course would not have been available," *Babick v. Berghuis*, 620 F.3d 571, 577 (6th Cir. 2010).

impeachment evidence is not material when ample information exists for an effective cross examination. Long knew, of course, that Dr. Monroe had collected semen during his examination of Bost—Dr. Monroe said as much in trial testimony. He also knew the only testing done on that evidence was observation under a microscope. Long was free to point out the potential exculpatory value of additional testing.

### 4. Cumulative impact assessment

With the above considerations in mind, we conclude our inquiry by asking whether the state court's determination that "the cumulative effect . . . is so minimal that it would have had no impact on the outcome of the trial," J.A. 1358–59, was "so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richardson*, 668 F.3d at 149 (quoting *Richter*, 562 U.S. at 103). This assessment requires us to weigh the strength of the government's case against the new evidence. *See Turner*, 137 S.Ct. at 1893. Here, the state court analyzed the government's evidence, concluding that it was "compelling." J.A. 1355.

The record supports the state court's conclusion about the strength of the evidence. Mrs. Bost gave detailed descriptions of the attacker and his clothing as soon as Concord officers responded to the scene. She confidently chose Long out of a crowd and photo arrays, telling officers, "there is no doubt in my mind that [Long] is the man that raped me." J.A. 1683. His description matched the one given at the scene. Mrs. Bost again pointed him out before the jury, and she identified his jacket and gloves as "identical" to the ones worn by her rapist. J.A. 217–18, 249–50, 1355.

24

On the other hand, as discussed above, reasonable jurists may conclude that the probative value of the new evidence is minimal.  Thus, the state court's balancing of the cumulative evidence was not unreasonable, and § 2254(d) requires us to respect this determination.

*     *     *

When Congress passed AEDPA over two decades ago, it created a high bar for defendants to satisfy before we may disrupt state court judgments.  In doing so, Congress placed great weight on the values of federalism and finality and thus limited the scope of errors that require relief.  Our review must be performed as statutorily prescribed.  Therefore, the judgment of the district court is

AFFIRMED.

THACKER, Circuit Judge, dissenting:

For more than 43 years, Ronnie Wallace Long ("Appellant") has been in prison for a rape that he has consistently maintained he did not commit. From the time of his conviction until now, a trickle of posttrial disclosures has unearthed a troubling and striking pattern of government suppression of material evidence, in violation of Appellant's due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we are asked to decide whether the decision of the Superior Court in Cabarrus County, North Carolina, which denied Appellant's Motion for Appropriate Relief ("MAR") (hereinafter the "MAR court"), "resulted in a decision that was contrary to" or "involved an unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1). Remarkably, the majority -- along with the magistrate judge and the district court -- acknowledge that the MAR court's imposition of a preponderance of the evidence standard on Appellant's *Brady* claim "directly contradicts Supreme Court precedent." *Ante* at 16; *see also* J.A. 1679–80 (magistrate judge Recommendation); *id.* at 1724 (district court adopting Recommendation). On this point, I agree with the majority. The Supreme Court has held that a defendant attempting to prove a *Brady* violation is held to a lower burden, in that he or she must demonstrate a "'reasonable probability' of a different result." *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1993)).

But notwithstanding the MAR court's imposition of an erroneous burden -- which is indisputably contrary to clearly established federal law and an error that pervades the

26

entire MAR court decision -- the majority strains to isolate a single phrase of a single sentence of the MAR court's Conclusions of Law as separately "sufficient" to reject Appellant's § 2254 claim. *Ante* at 17; *see id.* at 16 (explaining that relief is not warranted under § 2254(d)(1) unless "*each* ground supporting the state court decision is examined and found to be unreasonable" under AEDPA) (quoting *Wetzel v. Lambert*, 565 U.S. 520, 525 (2012) (per curiam) (emphasis in *Wetzel*))). This isolated phrase states that the cumulative effect of the suppressed evidence was "so minimal that it would have had no impact on the outcome of the trial." J.A. 1359 (hereinafter, "the No Impact Conclusion").

I disagree with this approach for two reasons. First, the No Impact Conclusion cannot serve as an "alternative ground" supporting the state court decision under *Wetzel*, because it was inextricably intertwined with the erroneous *Brady* standard mentioned above. Second, even if the No Impact Conclusion were a separately sufficient "ground" supporting the decision, such conclusion was objectively unreasonable. Far from being "so minimal that it would have had no impact on the outcome of the trial," J.A. 1359, there is zero doubt in my mind that the cumulative effect of the suppressed evidence in this case "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

For these reasons, and as set forth in detail below, I must dissent.

27

## I.

### *The No Impact Conclusion is Not an "Alternative Ground"*

In the face of a glaring and pervasive constitutional error appearing several times in the MAR court's decision -- which the majority acknowledges -- the majority, citing *Wetzel v. Lambert*, 565 U.S. 520 (2012), nonetheless bends over backward to pluck out a single phrase of a single sentence of the MAR court's Conclusions of Law as separately "sufficient" to reject Appellant's § 2254 claim. *Ante* at 17. I cannot adopt this contorted view.

### A.

### *The "Alternative Ground" Doctrine*

The "alternative ground" doctrine set forth in *Wetzel* does not contemplate a case such as this. In *Wetzel*, the state court addressed a post-conviction *Brady* claim made by defendant James Lambert, who was convicted and sentenced to death for the murder of two patrons during a robbery of a bar. *See* 565 U.S. at 521. Lambert argued that the Commonwealth of Pennsylvania withheld a police activity sheet, which noted that one of the Commonwealth's primary witnesses, Bernard Jackson, who was involved with the murders and identified Lambert as one of his accomplices, also noted that a man named Woodlock was "a co-defendant." *Id.* The police activity sheet, however, did not indicate the crime to which Jackson was referring (and Jackson had been involved in other robberies). *See id.* Nonetheless, Lambert claimed the police activity sheet was exculpatory because "it suggested that someone other than or in addition to him" was involved with the murders. *Id.*

28

The Pennsylvania Supreme Court rejected the *Brady* claim, holding that the police activity sheet was not material for two reasons: first, it was ambiguous as to the particular crime in which Woodlock was involved, and the idea that "someone else was involved in the . . . robbery [was] purely speculative at best"; and second, the activity sheet "would not have materially furthered the impeachment of Jackson at trial as he was already extensively impeached by [other witnesses]." *Wetzel*, 565 U.S. at 523 (internal quotation marks omitted). On federal habeas review, the district court denied the writ, but the Third Circuit reversed, relying only on the impeachment grounds and concluding that it was "patently unreasonable for the Pennsylvania Supreme Court to presume that whenever a witness is impeached in one manner, any other impeachment evidence would be immaterial." *Id.* (internal quotation marks omitted).

The United States Supreme Court reversed, holding that the Third Circuit erred because it "overlooked the determination of the state courts that the [police activity sheet was] entirely ambiguous," as an alternative to the impeachment determination. *Wetzel*, 565 U.S. at 524 (internal quotation marks omitted). Significantly, the Court noted that the state court used the word "[m]oreover," "confirming that [the impeachment determination] was an *alternative basis* for its decision" *Id.* at 524–25 n.* (emphasis supplied); *see also id.* at 524 (describing the impeachment determination as an "alternative ground"). If the ambiguity determination was reasonable (which the Court did not decide), the impeachment decision was "beside the point." *Id.* Thus, the Court reasoned that it would

29

not impose the burden of retrial "unless *each* ground supporting the state court decision is examined and found to be unreasonable under AEDPA." *Id*. at 525 (emphasis in original).

B.

### *Wetzel is Inapposite*

Here, unlike the ambiguity and impeachment grounds considered in *Wetzel*, the No Impact Conclusion and the improper *Brady* analysis cannot be isolated from one another so as to be considered "alternative." *See Alternative*, Oxford English Dictionary, 2d ed. (2004) (defining "alternative" as "[s]tating or offering the one or the other of two things of which either may be taken," and "Of two things: Such that one or the other may be chosen, the choice of either involving the rejection of the other"); *see also Alternative*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/ 5803?redirectedFrom=alternative#eid (Nov. 22, 2019) (defining "alternative" as "characterized by . . . disjunction"). To the contrary, the No Impact Conclusion is inextricably intertwined with Appellant's *Brady* claim because the No Impact Conclusion refers to, and necessarily depends on, the MAR court's *Brady* conclusion. I quote directly from the MAR court's decision:

> As to the cumulative [e]ffect of the items of evidence the defense alleges they did not receive, this court finds, ***based on the findings of fact and conclusions of law stated herein***, that the contents of several of the items the defense alleges they did not receive were fully addressed in front of the jury; that other materials contained in the reports were more favorable to the State's case than the defendant's; and that any remaining matters that were not presented to the jury were of little or no value to the case as a whole; and that ***the cumulative [e]ffect***

30

> *of any items with any value is so minimal that it would have had no impact on the outcome of the trial.*

J.A. 1358–59 (emphases supplied). The bolded language is key to the analysis here because the "findings of fact and conclusions of law" referenced in the MAR court's decision are actually *based on* the preponderance burden that is contrary to *Brady*. Thus, in the paragraph quoted above, when the MAR court concludes there was no impact on the outcome of the trial, it necessarily refers to its pervasive error that, as to each individual piece of evidence, Appellant did not demonstrate "by a preponderance of the evidence" that the evidence "would have changed the result." *See* J.A. 1356 ¶¶ 2 (general), 7 (State Bureau of Investigation ("SBI") lab reports as a whole), 8 (shoeprint analysis), 9 (hair analysis), 10 (paint, fiber, and matches analysis), 11 (Detective Van Isenhour's identification report). The No Impact Conclusion, therefore, is merely a cumulative view of the impact of each erroneously analyzed piece of *Brady* evidence, not an alternative ground for relief.

That the No Impact Conclusion is colored by the erroneous *Brady* burden comes into even clearer focus in the paragraph directly following the No Impact Conclusion, which demonstrates that the MAR court viewed the cumulative effect of the evidence through the improper *Brady* lens:

> When balancing the strength of the State's case with the cumulative [e]ffect of the items of evidence the defense alleges they did not receive, [Appellant] has failed to prove *by a preponderance of the evidence* that the cumulative [e]ffect of

31

these items are material or would have changed the result at trial.

J.A. 1359 (emphasis supplied). Significantly, the grounds relied upon by the state court in *Wetzel* exhibited no such relationship, as they were *actually separately sufficient*. Not so here. Clearly, the majority should not have invoked *Wetzel*.

Finally, the majority suggests we "should not jump to conclude that erroneous reasons or statements infect another sufficient reason." *Ante* at 18. But here, there is no "jumping" necessary. The No Impact Conclusion explicitly states that it is "*based on* the findings of fact and conclusions of law stated herein," and those findings and conclusions are infected by the erroneous *Brady* burden the majority recognizes. J.A. 1358–59 (emphasis supplied). As stated above, in *Wetzel*, the Supreme Court found significant the state court's use of the word "*[m]oreover*" as "confirm[ation]" of an alternative basis. 565 U.S. at 525 n.* (emphasis supplied). But, as the majority points out, the MAR court's erroneous summary conclusion uses the phrase "*[I]n summary*" (as opposed to "moreover"), *Ante* at 15 (emphasis supplied), in concluding Appellant "has failed to prove by a preponderance of the evidence that there exists newly discovered evidence . . . of a nature as to show that upon another trial a different result would probably be reached," J.A. 1359. The phrase "In summary" necessarily means that the MAR court viewed the No Impact Conclusion through the erroneous *Brady* lens, and could not have relied on it as an alternative ground divorced from that incorrect standard.

In no other case cited by the majority for the "alternative ground" doctrine does this infectious relationship exist. *See Ante* at 17 n.7. In *Parker v. Matthews*, the Court invoked

32

*Wetzel* where the state supreme court applied an incorrect burden of proof for a sufficiency challenge on direct review, but it also decided that the jury instructions at trial relayed the correct burden to the jury, and the proof supported the jury's findings. *See* 567 U.S. 37 (2012). In *Littlejohn v. Trammell*, the Tenth Circuit invoked *Wetzel* where the state court may have erred in its presentation to the jury of Oklahoma's three choices for capital sentencing, but as to separate alleged federal law violations, the state court's presentation to the jury was not "insufficient, misleading, or erroneous." *See* 704 F.3d 817, 831 (10th Cir. 2013) (internal quotation marks omitted). And finally, in *Blackston v. Rapelje*, the rationales offered by the state court only "overlap[ped]" in the factual sense -- they each involved a separate reason for suppressing witness recantations. 780 F.3d 340, 354 (6th Cir. 2015). These rationales were not based on each other. But the No Impact Conclusion is clearly "based on" the erroneous determinations made by the MAR court in this case.

## II.

### *The No Impact Conclusion is Objectively Unreasonable*

### A.

According to *Wetzel v. Lambert*, in order for the No Impact Conclusion to stand as an alternative ground supporting the MAR court's decision, we must "examine[]" it and find it "to be []reasonable under AEDPA." 565 U.S. 520, 525 (2012). Even if the No Impact Conclusion could somehow be read to stand on its own in support of the MAR court's decision, the majority's conclusion that the No Impact Conclusion is a reasonable materiality determination under § 2254(d) is patently incorrect. The state court's

33

determination that the cumulative effect of the evidence at issue would have *no impact* on

Appellant's trial is "so lacking in justification" that it was an "error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement."

*Richardson v. Branker*, 668 F.3d 128, 149 (4th Cir. 2012) (quoting *Harrington v. Richter*,

562 U.S. 86, 103 (2011)).

The suppressed evidence here[9] not only undermines the state's investigation of the

crime, but also provides invaluable fodder for impeachment of the state's witnesses.  This

suppressed evidence referred to in this separate opinion includes:

- a report from Detective Van Isenhour, one of the state's key witnesses, demonstrating that he actually took 15 items from the crime scene to be tested at the SBI lab, rather than just two items, as he testified, and indicating that those items did not remain in his custody, as he also testified;

- reports listing forensic results of paint/fiber, matches, and hair tests that failed to link Appellant to the crime; and

- medical records indicating that semen samples were taken from the victim.

## B.

### *Additional Points from the Record*

Of note, the description of the underlying crime and investigation set forth in the

majority opinion is not sufficiently complete so as to provide a full picture of what

---

[9] The magistrate judge concluded that the MAR court's decision that the reports and paint/fiber, matches, and hair forensic test results were not suppressed "contravened the United States Supreme Court *Brady* jurisprudence." J.A. 1675.  The state did not object to this conclusion.

34

happened here.  Additional and salient points are worth noting about the relative strength -- or weakness -- of the state's case.

1.

*The Underlying Crime and Investigation*

First, just a few hours after the attack, the victim described her assailant to officers of the Concord Police Department as approximately five foot five to five foot nine inches with a slender build; a "tiny pencil mustache"; and "yellow" or "light colored" black skin. J.A. 369, 167–68.  She also said her assailant was "wearing a leather coat, toboggan, and . . . gloves."  *Id*. at 1429.

The police believed the intruder had broken into the victim's house by climbing up a painted outside banister and entering through a second-story window.  Officers collected evidence from the crime scene, including carpet fibers from the den and hallway of the victim's home; paint from the outside banister; partially burned matches found near the window where the suspect entered; hair found at the crime scene; a latent shoe print collected from the banister; and the victim's clothes worn at the time of the attack.

2.

*Courtroom Identification*

Once police officers identified Appellant as a suspect in the case, rather than place Appellant in a typical lineup, the officers instead asked the victim to come to the Cabarrus County Courthouse on May 10, 1976, where Appellant was scheduled to appear in court for an alleged trespass violation.   In the courtroom, Appellant was wearing a leather coat. The victim testified that when the judge called Appellant's name as a defendant in the

35

trespass matter, she recognized him and motioned to the police that Appellant was her rapist. The victim said she had "no doubt" that Appellant was her rapist. She explained, "**I will never forget his profile, the coloring of his skin . . . .** " J.A. 314–15. But of note, Appellant is a black man *with dark skin*, unlike the light skinned black man the victim described to police in the hours immediately following the rape. *See id*. at 26; Exhibit, *Long v. Perry*, No. 1:16-cv-539 (M.D.N.C. filed May 26, 2016), ECF No. 1 Ex. 4. The majority completely ignores this fact, instead stating that the "description matched the one given at the scene." *Ante* at 24. It did not.

Only 22 minutes after the courtroom identification, the officers took the victim to the police station and showed her six to eight photographs of suspects, one of which was Appellant's. Of note, Appellant was the only person in the photos wearing a leather coat, which was the type of clothing the victim initially identified her assailant as wearing. She chose Appellant's photo as the photo of her assailant. When the trial court asked the victim, "Is it possible [the officers] could have asked you to pick out [Appellant]?" the victim replied, "They could have, but I don't know." J.A. 179.

### 3.

#### *Appellant's Alibi*

The rape occurred around 9:30 to 9:45 p.m. During trial, Appellant offered evidence that on the day of the rape, he had attended a class reunion planning meeting and made plans with friends to go to Charlotte later that night. Appellant's mother testified that Appellant was at home with her from around 8:30 p.m. until after 10:00 p.m. During this time, Appellant participated in a group phone conversation with his mother, his girlfriend,

and his girlfriend's son from 9:00 p.m. to 9:45 p.m. Shortly after 10:00 p.m., Appellant's father returned home with the family car, and Appellant left to meet friends in Charlotte, as planned.

4.

*Withheld Test Results and Conflicting Reports*

Detective Isenhour processed the crime scene and took custody of the evidence. On May 11, 1976, the day after Appellant was arrested, Detective Isenhour delivered 15 items of evidence to the SBI crime lab for forensic testing: (1) green toboggan recovered from Appellant's car; (2) black gloves received from Appellant's car; (3) Appellant's leather jacket; (4) head hair from Appellant; (5) pubic hair from Appellant; (6) carpet fibers from the den area of the crime scene; (7) carpet fibers from the hallway area of the crime scene; (8) paint from the crime scene; (9) hair found at the crime scene, potentially from the suspect; (10) pubic hair from the victim; (11) matchbooks from Appellant's car; (12) partially burned matches from the crime scene; (13) clothing the victim worn at the time of the rape; (14) the latent shoe print from the crime scene; and (15) known shoe impressions from Appellant.

In a report dated May 12, 1976, Detective Isenhour detailed the work he had done in the case, including submitting the 15 items detailed above to the SBI lab the day before. *See* J.A. 1480–83 (the "May 12 Report"). Detective Isenhour noted that he left the evidence in the SBI's custody and picked it up when the tests were completed.

Of note, Detective Isenhour's May 12 Report listed all 15 items he transported to the lab and the type of examinations requested. Specifically, Detective Isenhour asked the

37

SBI to test the evidence to determine whether: (1) Appellant's hair matched suspect hair found at the crime scene -- **it did not**; (2) Appellant's hairs could be located on the victim's clothes -- **they were not**; (3) paint or carpet fibers from the crime scene could be found on Appellant's black leather jacket or black gloves -- **they were not**; (4) burned matches found at the crime scene were the same as matches taken from Appellant's family car -- **they were not**; and (5) a latent shoeprint from the scene could be matched to Appellant's shoes -- **it was not a conclusive match**. The shoeprint test was the only test result that was even arguably helpful to the prosecution. Even still, the SBI merely concluded that Appellant's shoes "*could have made*" the latent print collected at the scene because they were "of the same tread design" as the shoes that made the print. J.A. 1464 (emphasis supplied). But significantly, the SBI noted that there were "*an insufficient number of distinct characteristics*" to *conclusively* identify Appellant's shoes as the ones that made the print. *Id*. (emphasis supplied). After the testing, the SBI generated reports explaining each of these results. *See id*. at 1464–74 (the "SBI Reports"). Neither Detective Isenhour's May 12 Report, nor the SBI Reports were disclosed to the defense before trial.

Curiously, at some later point, Detective Isenhour created a second, undated report regarding his work on the case. *See* J.A. 1484–85 (the "Undated Report"). In the Undated Report, and **contrary to the earlier May 12 Report**, Detective Isenhour asserted that he transported **only** the latent shoeprint and prints from Appellant's shoes to the SBI lab. The shoeprints, of course, had resulted in the only forensic evidence that provided any possible support, albeit weak, to the state's theory of the case. Every other piece of evidence analyzed by the SBI lab actually undercut the state's case. In the Undated Report,

38

Detective Isenhour described the other items of evidence collected during the investigation but notably omitted the fact that he also took these items to the SBI lab for testing. Moreover, he explicitly stated that he collected Appellant's clothes but that he maintained them in his possession -- a claim that was untrue, because, per his own (withheld) May 12 Report, Detective Isenhour had taken Appellant's clothes to the lab and left them in the SBI's custody for testing.

Crucially, as noted, the May 12 Report, which detailed the 15 pieces of evidence actually delivered to the SBI lab, was never disclosed to Appellant before trial, while the Undated Report was disclosed. This means Appellant was not advised that the additional evidence omitted from the second report had been taken to the SBI for testing. And, significantly, Appellant was not informed of the test results that **did not incriminate** him (which was basically all of them).

5.

*Withheld Rape Kit Evidence*

The victim's rape kit, which included three slides of the assailant's semen, was provided to the police department following the victim's hospitalization. Specifically, an authorization for release form reflects, "Sargeant [sic] Marshall J. Lee with the C[oncord] P[olice] D[epartment] picked up the victim's biological specimens at the hospital at 12:35 a.m. on April 26, 1976." J.A. 1665. Surely there is no evidence more material in a rape case than the assailant's semen, and yet, though the state obtained semen samples from the victim's assailant, these samples went no further. Again, curious. Why might that be? Critically, this rape kit is not listed in either of Detective Isenhour's reports, and there is

39

no record of what happened to the rape kit after it was received by the police department or whether it was tested at all.

In attempt to counter the significance of the withheld rape kit evidence, the majority argues that any analysis of the semen would have been of limited value in 1976. *See Ante* at 23 n.8. Interesting. So, why collect semen evidence in the first instance? And why fault Appellant for failing to test this evidence or cross examine about it? This argument highlights the importance of semen evidence in a rape case. Again, the arguments on behalf of the state on this point are offensive. And ridiculous.

6.

### *Trial Testimony*

Appellant was tried over 43 years ago on September 27, 1976. Detective Isenhour's testimony at trial, like his second undated report, flatly contradicted his earlier May 12 Report. Detective Isenhour testified at trial that the only evidence he brought to the SBI lab was the latent shoeprint from the crime scene and prints from Appellant's shoes for comparison, and that he remained with the SBI examiner while the examiner reviewed the latent shoeprint. Detective Isenhour also testified that Appellant's clothes never left his custody. In short, he lied. Repeatedly.

In sharp contrast to his testimony, the record reflects that Detective Isenhour's testimony was not only false, but also incomplete. Most significantly, at Detective Isenhour's request, the SBI tested 13 items of evidence that Detective Isenhour omitted from both his trial testimony and the Undated Report. These test results -- which did not support the state's theory of the case -- were not disclosed to Appellant's counsel, and were

40

never revealed to the jury. Moreover, Detective Isenhour did not remain with the SBI examiner during testing as he testified. Instead, Detective Isenhour retrieved the evidence, including Appellant's clothing, from the SBI at least five days after he dropped it off for testing.

Beyond Detective Isenhour's dubious trial testimony, another officer with the Concord Police Department, Detective David J. Taylor, testified that the matches he retrieved from Appellant's family car were "of [a] similar nature" to burned matches found near the crime scene that were believed to have been left by the suspect. J.A. 378. Again, not true. This testimony was directly contrary to the withheld SBI Report, wherein SBI Agent R.D. Cone concluded that four of the five matchbooks collected in Appellant's family car were *eliminated* as possible origins for the burned matches in the victim's home. Of note, although Agent Cone could not exclude the fifth matchbook on that basis, he indicated that the burned matches from the scene "probably did not originate from this matchbook." J.A. 1463.

## C.

### *Objectively Unreasonable*

With this complete background laid bare, I am compelled to disagree with the majority ruling that the No Impact Conclusion was an objectively reasonable ground supporting the MAR court's decision. Clearly, it was not.

41

1.

### *The MAR Court Relied on a Faulty Favorability Analysis*

The first reason the No Impact Conclusion is objectively unreasonable is that the MAR court relied on an erroneous view of favorability under *Brady* in reaching this conclusion.

In reaching the No Impact Conclusion, the MAR court reasoned that "other materials contained in the reports were more favorable to the State's case than the defendant's," and "any remaining matters that were not presented to the jury were of little or no value to the case as a whole." J.A. 1359. But both the magistrate judge and the district court correctly recognized that the MAR court erred by undercutting the favorability and value of the withheld evidence.

Specifically, the magistrate judge explained that the MAR court's conclusion that the withheld SBI Reports concerning the carpet fibers, paint, and hair found at the crime scene "did not qualify as exculpatory" was "contrary to *Kyles*," and that such evidence "would have had some weight and its tendency would have been favorable to [Appellant]." J.A. 1659–60 (quoting *Kyles*, 514 U.S. at 451). The magistrate judge also reasoned that the MAR court "unreasonably determined that the SBI Matches report actually favored the state more than [Appellant]," and "the jury did not hear any evidence regarding the matches and matchbooks more favorable to [Appellant] than the [withheld] SBI Matches Report." *Id*. at 1661–62.

The magistrate judge observed that, with regard to the rape kit evidence, the MAR court "interpreted the concept of favorable evidence too narrowly" because it equated

42

favorability with exculpation. J.A. 1663. The magistrate judge noted that the failure to disclose the existence of the rape kit "possess[es] a degree of favorability to [Appellant], in that in tends to impeach the quality of the state's investigation," and the MAR court "ran afoul of and/or unreasonably applied *Kyles* by denying relief on the grounds that the victim's medical records did not qualify as exculpatory." *Id*. at 1665–66.

Finally, the magistrate judge explained that the MAR court "unreasonably applied *Brady* and *Kyles* in failing to deem favorable the evidence of conflicts between Detective Isenhour's testimony and the SBI Reports, as well as the evidence of the two differing versions of Detective Isenhour's summary reports," because that court "failed to account for the impeaching value of the two differing versions of the summary reports." J.A. 1669. The district court agreed with this favorability analysis, *see* J.A. 1724, and the majority takes no issue with any of these favorability analyses. Nor could it. The Supreme Court has held, "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility" violates the Constitution. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

But the magistrate judge, district court, and majority fail to recognize that the MAR court *directly relied* on its erroneous favorability findings to support its No Impact Conclusion. The MAR court specifically referenced "the cumulative [e]ffect of any items with any value" as having "no impact," but clearly the MAR court did not properly analyze the "value" of the withheld evidence. J.A. 1359. Accordingly, because the MAR court's No Impact Conclusion was infected by its incorrect and unreasonable favorability analysis, it is unreasonable and not worthy of deference.

43

2.

*The MAR Court Incorrectly Minimized the Significance of the Suppressed Evidence*

In reaching the No Impact Conclusion, the MAR court also unreasonably minimized (and thereby, improperly weighed) the significance of the withheld evidence, stating that "several of the items [of withheld evidence] were fully addressed in front of the jury" and other evidence had "minimal" value. J.A. 1359. This adds to the objective unreasonableness of the No Impact Conclusion.

Tellingly, in its briefing, the state does little to assert a substantive defense of the officers involved. Instead, the state also attempts to minimize the significance of the evidence. *See, e.g.*, Resp't's Br. 22 ("The impeachment value of [Detective Isenhour's report demonstrating he did not retain custody of the latent shoeprint] is marginal and could have been explained by Isenhour as a mistake, misunderstanding, or the report itself could be incorrect."); *id.* ("Regardless of the reason for th[e] inconsistency [in whether Detective Isenhour relinquished custody of the other evidence], it does not change the results of any of the SBI reports."). While these may have been useful arguments for the state to make to the jury at trial, the rule is not that only *unassailable* evidence must be disclosed to the defense. Rather, **any favorable and material evidence must be disclosed**.

On this point, three of the state's arguments in particular are worth addressing: (1) the suppressed evidence is cumulative of counsel's arguments at trial; (2) defense counsel could have tested certain items or questioned witnesses at trial whether certain items had been tested, but made a strategic decision not to do so; and (3) the suppressed evidence

44

does not undermine the victim's identification of Appellant as her rapist. Each of these claims is meritless.

a.

*Cumulative Evidence*

The state argues the evidence it withheld was merely cumulative of defense counsel's arguments at trial. But surely the state is aware (or at least should be) that it is elemental that counsel's arguments are <u>not</u> evidence in a case. It is literally black letter law. *See In re D.L.*, 603 S.E.2d 376, 382 (N.C. Ct. App. 2004) ("Statements by an attorney are not considered evidence."); *see also* N.C. Pattern Jury Inst. Crim. 101.37 ("The final arguments of the lawyers are not evidence, but are given to assist you in evaluating the evidence.").

Even if this were not the case, the state is wrong for two additional reasons. First, test results from the SBI carry much more weight than simply an unsupported argument from counsel. If the SBI reports had not been suppressed, Appellant's trial counsel would not have had to ask the jury to just take his word for it that most of the forensic evidence could not connect Appellant to the crime scene; *they could take the SBI's word for it*. Indeed, I am quite confident that if the SBI lab had found affirmative forensic evidence that tied Appellant to the crimes charged, the state not only would have disclosed it, but would have been shouting it from the rooftops at trial.

Second, even more material than one exculpatory test result is the cumulative effect of the legion of exculpatory test results in this case. As Appellant's trial counsel testified during the MAR court's 2008 evidentiary hearing:

45

> [T]he tests . . . have both an individual and a cumulative effect.
> . . . I got one test here that does not implicate you. Okay. I've
> got a second test that does not implicate you. And now the jury
> is paying attention. And now I've got a third test and a fourth
> test, and pretty soon it creates a snowball effect that you're not
> the defendant. And that's why I believe every one of those
> tests was critical.

J.A. 1099–1100; *see also id.* at 1286 (operator of private forensic laboratory testifying that in a violent crime such as this one, it would be unlikely not to find some sort of trace evidence in any of the items submitted for analysis). Similarly, as noted in the amicus brief filed in this case by forensic science scholars:

> [J]urors use a coherence-based reasoning method, in which
> they integrate the whole of the evidence that they receive. That
> is, a piece of strong inculpatory evidence can make the entire
> evidence set appear inculpating. By the same token, including
> an *exculpating* item can push the evidence towards a
> conclusion of innocence. Critically, evidence is not
> independent: it is related, and thus the exclusion of evidence of
> innocence can make an entire case against a defendant seem
> far more compelling than it is.

Amici Curiae Br. of Professors & Scholars 8 (citations and internal quotation marks omitted) (emphasis in original).

In short, results of forensic analyses, whether inculpating or exculpating, are a critically important type of evidence. Indeed, the significant impact of this evidence makes it all the more important that forensic analyses be disclosed to defense counsel and the court in all cases. These tests are probative and can be powerful evidence of innocence; conversely, "[w]ithout a narrative to contrast the prosecution's story, a jury will have little reason to give any weight to the defense." Amici Curiae Br. of Professors & Scholars 8.

46

b.

*Defense Strategy*

The state further argues that the suppressed evidence is not material because Appellant's trial counsel could have learned of the SBI's results by (1) testing the evidence themselves; or (2) questioning witnesses at trial as to whether certain items had been tested. But, according to the state, Appellant made a "strategic decision" not to do so. Resp't's Br. 29. Similarly, the magistrate judge faulted defense counsel for failing to ask the doctor who prepared biological evidence slides "whether or not he had performed any further testing on the spermatozoa," such as connecting it to Appellant. J.A. 1691 n.16.

This argument is nonsensical and offensive. Such an argument completely turns the burden of proof in criminal cases on its head. Again, I am shocked as to the apparent need to educate the state that the burden of proof in criminal cases rests with the state, and remains with the state throughout the course of the trial. It is unquestionably not a defense counsel's responsibility to elicit testimony about potentially harmful forensic evidence against his/her own client by blindly questioning witnesses in front of the jury. It is axiomatic that it is not the defendant's job to prove himself innocent. Rather, it is the state's job to build the case against the defendant. And when the state tests evidence in an effort to build that case, it is the state's responsibility to turn over the results to the defendant -- whether those results are inculpatory or exculpatory -- rather than hide the fact that the tests ever occurred in the first place.

Finally, underlying the premise of the state's defense strategy argument is that it requires defendants to necessarily assume the prosecution withholds evidence and lies

47

about it as a matter of course.  In this case, the state did lie and withhold evidence. But one would hope that is not the norm in North Carolina.

c.

*Victim's Identification*

Finally, the state places undue weight on the "strength" of the victim's identification of Appellant as her assailant, repeatedly asserting that the suppressed evidence is immaterial because it does not directly undermine this identification.  Resp't's Br. 30.  But the suppressed evidence does not need to explicitly undermine the victim's identification for it to be material.  Here, the suppressed forensic results can -- and do -- cast doubt on the accuracy of the victim's cross-racial identification.

As explained by the Innocence Project, eyewitness identifications have "become less reliable and more suspect," while "jurors continue to place disproportionate weight on positive identifications at trial."  Innocence Project Amicus Br. 11, 12.  And "[h]eightened stress," like the victim experienced in the case at hand, "is well-understood to have a deleterious effect on an eyewitness's ability to encode a memory and subsequently make an accurate identification."  *Id*. at 17–18 (citing Kenneth A. Deffenbacher, *et al*., *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 L. & Hum. Behav. 687, 692, 694, 699 (2004)).  Further, suggestive identification procedures can exacerbate an already tenuous aspect of criminal trials.  The National Academy of Sciences has "identified a number of scientifically-supported best practices that can improve identification accuracy and avoid improperly influencing an eyewitness's memory."  *Id*. at 23.  Recommendations include "implementing double-blind lineup and photo array

48

procedures, using standardized non-biased witness instructions, documenting witness confidence in identification, and videotaping the identification process." *Id*.

None of these practices were followed here. To the contrary, the officers brought the victim into a courtroom where Appellant was singled out and already cast in a negative light. "[T]he courtroom setting itself was enough to prejudice the victim's identification of her assailant[,] as it suggested to the victim that the parties present were already in legal trouble." Innocence Project Amicus Br. 24–25. And in the subsequent photo array provided by the police, Appellant was the only one wearing a leather coat, which of course was the item of clothing the victim recalled her assailant wearing.

Indeed, the state's conduct in suppressing the forensic test results likely caused the victim's identification to carry more weight with the jury than it deserved, since there was zero forensic evidence to contradict it. In reality, every bit of forensic evidence in this case at worst directly contradicted the victim's purported identification and, at best, failed to support it. The false bolstering of the victim's identification in this case is highlighted by the prosecutor's statements to the jury -- now known to be demonstrably untrue -- that "[e]very word [the victim] uttered is fully and entirely corroborated by the evidence as was seen by the officers in her home . . . and the latent evidence found by the officers," J.A. 526–27, and that:

> [The victim's] testimony is not only accurate, but totally consistent with every piece of physical evidence existent. Everything she says happened that is capable of being corroborated by physical evidence. . . is so corroborated . . . . Every piece of physical evidence points unerringly to the fact that [the victim] told you exactly what happened that night unerringly.

49

J.A. 536.

Not true.

If the May 12 Report demonstrating Detective Isenhour's untruthfulness and the SBI Reports excluding Appellant had been disclosed, the jurors could have more credibly questioned and considered the reliability of the victim's identification in the absence of other evidence. Accordingly, the fact that the victim testified that she had "no doubt whatsoever" that Appellant was her assailant only served to make the suppressed evidence, which did not corroborate her identification, all the more crucial for the jury to hear. Withholding this evidence distorted the strength of the victim's identification, and thereby, distorted the strength of the state's case in total.

3.

In sum, in my view there is no "possibility for fairminded disagreement" that the cumulative effect of the suppressed evidence, favorable to the defendant and suppressed by the state in order to make its own case appear stronger, clearly met *Brady*'s materiality requirement. *Richardson*, 668 F.3d at 149. Considering both the exculpatory and impeachment effects of the suppressed evidence cumulatively, it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. It follows, then, that the MAR court's conclusion that the suppressed evidence would have "no impact" on the outcome of trial is not just unreasonable, but patently wrong.

50

### III.

### *Actual Innocence*

Appellant faces an exceedingly heavy burden to prove his actual innocence by clear and convincing evidence, as he must in order to obtain relief on this second or successive habeas petition. *See McQuiggen v. Perkins*, 569 U.S. 383, 394–95 (2013); *Schlup v. Delo*, 513 U.S. 298, 327 (1995). However, Appellant has provided new, reliable evidence that helps to exculpate him as the perpetrator, casts doubt on the victim's eyewitness identification of him, provides substantial impeachment value against the testifying officers, and calls into question the integrity of the investigation at large. As a result, Appellant should be permitted to obtain the additional discovery he seeks to prove his actual innocence, and I would remand to the district court to consider this question in the first instance.

### IV.

### *Finality*

I end with a note on the need for finality. The majority is correct that finality is an important interest in our justice system. For that reason, the actual innocence gateway standard for procedurally defaulted claims is a necessarily heavy burden. But, it should not be an impossible burden.

Finality should not carry the day in this case. This is so because the length of the procedural history between Appellant's conviction and where we stand today is not a result of Appellant's actions. For more than 43 years, Appellant has consistently maintained his innocence and continued to search for the truth. In contrast, we arrive at this point as a

51

result of the actions of the state -- the slow, stubborn drip of undisclosed evidence that the state originally claimed did not exist.

In this circumstance, Appellant must prevail. To hold otherwise would provide incentive for the state to lie, obfuscate, and withhold evidence for a long enough period of time that it can then simply rely on the need for finality. That, I cannot abide.